# McGrew *et al. versus* Stone.

1. Where a party is dealing with a subject full of risk, greater caution and diligence are required to prevent injury by reason of it.

2. The general rule is that a man is answerable for the consequences of a fault which are natural and probable ; if his fault happen to concur with something extraordinary and not likely to be foreseen, he will not be answerable.

3. The law gives no redress for inevitable accidents and those resulting from mutual negligence ; when the injury comes from the exclusive negligence of one party, he cannot shield himself from liability by calling it an accident. The maxim, *causa proxima non remota spectatur*, means this.

4. One engaged in an act which the circumstances indicate may be dangerous to others; and the event whose concurrence is necessary to make the act injurious, can be readily seen as likely to occur under these circumstances and unite with the act to inflict the injury, is liable if he does not take all the care which prudence would suggest to avoid the injury.

5. Morrison *v.* Davis, 8 Harris 171, and Scott *v.* Hunter, 10 Wright 192, commented on and compared.

[McGrew v. Stone.]

ERROR to the Court of Common Pleas of *Allegheny county.*

This was an action on the case to February Term 1865, brought by James McGrew and others, trading as McGrew & Co., against William Stone, for injury done to the plaintiff's coal-barges by a sunken barge of the defendant, which, it was alleged, had come into collision with the plaintiff's barges through negligence of the defendant in mooring his barge. Early in January 1865, there had been a coal-boat rise of 10 or 12 feet in the Monongahela river, and on the 10th of that month the defendant had seven barges moored in the river at the Monongahela bridge, to the third pier from the south shore, where they had been for three or four weeks previously. On the night of that day, one of the barges of the defendants sank, and was carried under the surface down the stream, and on the 12th was driven by the force of the stream under the plaintiff's barges, which were moored at their private landing on the river. Three of their barges were thereby sunk, and a fourth injured. For these injuries the suit was brought.

The plaintiffs showed by a witness that on a 12 feet rise the current at the pier where defendant's barges were moored is very rapid, and that at a good stage of water there are many coal-flats, canal-boats, and steamboats, at private landings, for a mile below on the south side of the river. They then proposed to ask the witness " whether the third pier from the south side of the Monongahela bridge is a safe or dangerous place for moorage as respects water-craft moored on either side of the river below the bridge and in the neighborhood, and to give his reasons for the opinion he may express."

Plaintiff further offered to prove, " that said third pier of bridge is an unsafe place of moorage for barges moored there, and that in case of accident to craft moored at that place great danger results to other craft moored at the shore and below the bridge."

Also, " that the pier of the bridge to which defendant's fleet of barges was moored is and was at the time of this disaster, an improper place of moorage, by reason of the dangers to such craft from floating ice, drift and the strong current, and the danger to other craft along shore below, in case of accidents to boats so moored, and that such danger did exist." All which being severally objected to and rejected, plaintiffs renewed the last offer in connection with further evidence to show that in case of accident to barges moored at said pier they are more difficult to handle and manage than when moored to shore.

In order " to rebut so much of defendant's evidence as tends to show that it was necessary to unloose and turn adrift his sinking barge in order to save the residue of his fleet and in avoidance of such alleged defence, the plaintiff proposed to prove that the third pier of bridge, at which defendant moored his fleet of barges, then was and is an unsafe, insecure and improper place of moor-

[McGrew *v.* Stone.]

age ; that barges there moored are exposed to unusual perils from floating ice, drift and the force of the current, when the river is at an ordinary coal-boat rise, to wit, twelve feet, and in case of accidents to barges moored at said pier, barges moored at the shore below the bridge, where the plaintiffs' barges were moored, are thereby exposed to great danger.''

These offers also were severally objected to and rejected.

The plaintiffs submitted eight points, of which the 4th, 6th and 7th were answered by referring to the charge of the court, and the others were refused.

The points are as follows :—

1. That the evidence in this case shows that the third pier from the south end of the Monongahela bridge is an unlawful and improper place for the moorage of coal-barges, except in case of necessity.

2. That if the jury believe from the evidence that the defendant, without necessity, moored his fleet of seven barges out in the current of the river Monongahela—500 feet from shore—and fastened the same by cables to the aforesaid pier, and kept the said fleet so moored for a period of three or four weeks, such acts and doings of the defendant were unlawful, and the defendant became liable for all damages resulting therefrom.

3. That if the jury believe from the evidence that the injury to the plaintiffs' barges resulted from the defendant having moored his barges at the pier aforesaid in the Monongahela river, the defendant is responsible (unless he has shown a defence on other grounds), although his said act may not have been the most proximate cause of the injury.

4. That if the jury believe from the evidence that the unloosing and sending adrift of his sunken barge, by the defendant, endangered the plaintiffs' barges, and they were lost in consequence of such act of the defendant, then defendant is liable.

5. That, under the evidence in this case, it was not a sufficient justification for the defendant's unloosing and turning adrift his sunken barge, that such act was necessary, in order to save the residue of his fleet.

6. If the court refuse the last point, then they are requested to charge that, if it be true, as claimed by the defendant, that it became necessary to unloose and turn adrift his sinking barge, in order to save the residue of his fleet, such necessity would not of itself be a sufficient justification for the defendant, if the jury believe from the evidence that such act of preservation, on account of the defendant's place of moorage being improper, could not be exercised without endangering the plaintiffs' barges.

7. That if the jury believe from the evidence that, owing to the situation of the aforesaid pier in the stream, and from the force of the current, the defendant's injured and sinking barge could

[McGrew *v.* Stone.]

not be unloosed and turned adrift without endangering the plaintiffs' barges, and subjecting them to such perils as caused their loss, the defendant took that risk upon himself when he voluntarily unloosed and turned adrift his sinking barge.

8. That the defendant was bound to hold his sunken barge to the pier and prevent its drifting, if the same could be done by the exercise of ordinary care and foresight; and if the jury believe from the evidence that in the exercise of such care and foresight the said barge might have been held to the pier by means of one of the head lines transferred to the sinking barge before she went down, or if after she sunk she might have been secured and held by means of the lashings attached to her, the defendant became responsible, and the plaintiffs are entitled to recover if the jury believe that their barges were sunk by the drift barge, without any concurring negligence or default on their part.

The court (Stowe, A. J.), amongst other things, charged:—

" In coming to a conclusion as to a verdict in this case, you must be careful to exclude from your consideration all matters which may have been stated by counsel or witness in reference to the length of time defendant's barges were moored at the third pier of the Monongahela bridge, previous to the night that defendant's barges sunk. Whether this was or was not a proper place of moorage, so far as the safety to the party using them is concerned, or as regards liability to accident to himself or others in consequence of the sinking of barges there moored, has nothing to do with this case as we submit it to you.

" Whatever evidence there may be which tends to show the danger of the place at which the sunken barge was moored at the time of the accident to her, so far as it may bear upon the amount of care and diligence defendant was bound to exercise in the emergency that arose, must be considered with that view and have its due weight upon that question; but whether defendant was careful or careless, wise or foolish, discreet or otherwise, in the mere fact of selecting and using the pier in question as a place of moorage, must be treated as of no importance in your examinations and conclusions upon the facts of this case.

\*          \*          \*          \*          \*          \*          \*

" What I mean and wish to impress upon you is this: if the exercise of an ordinary amount of judgment, skill and prudence on part of defendant could not have foreseen that his barge when sunk would have floated off and endangered the property of others, no matter who, in some way or another in consequence of its floating away from where it sunk, he is not liable, *even if he did not exercise the proper amount of skill and care in trying to save his barge while sinking, or in securing it so as to prevent it moving away after it sunk.*"

There was a verdict for the defendant.

[McGrew *v.* Stone.]

The rejection of the evidence offered by plaintiffs, the answers to their points and the portions of the charge given above, were assigned for error.

*Hamilton & Acheson* and *Kuhn & Cassidy*, for plaintiffs in error, cited Angell on Highways, § 445 ; Angell on Carriers, §§ 643 and 644 ; Secombe *v.* Wood, 2 M. & Rob. 290 ; Vantine *v.* The Lake, 2 Wallace, Jr., 52 ; Scott *et al. v.* Hunter *et al.,* 10 Wright 192 ; Beach *v.* Parmeter, 11 Harris 197 ; The Europa, 2 Eng. L. & Eq. R. 557 ; The Virgil, 7 Jur. 1174 ; 2 W. Rob. 205. Cited in Abbott on Shipping, note 1, p. 230 ; Angell on Highways, § 430 ; Lynch *v.* Nurdin, 1 Q. B. 29–35, 41 E. C. L. R.

*Woods* and *Jones & Howard,* for defendant in error, cited Baker *v.* The Hibernia, 1 Phila. R. 228 ; Browne *v.* Stone, Id. 141 ; 1 Hilliard 141 *et seq.*; Beatty *v.* Gilmore, 4 Harris 466 ; Scott *v.* Hunter, 10 Wright 192.

The opinion of the court was delivered, January 7th 1867, by

AGNEW, J.—This case cannot be well stated without a summary of the facts gathered from the evidence, and the rejected offers assigned now for error. They are about these : The basin in the Monongahela river, opposite the city of Pittsburgh, formed by the slackwater dam above the bridge and the shoals below the city, is filled with shipping ; the wharf from the bridge to the point being lined with coal-boats, canal-boats and steamboats, and perhaps some other craft. On the south side of the river, for a mile or more below the bridge, the shore, is occupied by boats at different points.·

The coal trade of Pittsburgh with the country below on the Ohio and Mississippi is very great, amounting to millions of bushels. It is carried on chiefly in large barges or flats, very deep, broad and unwieldy, carrying from eight to eleven thousand bushels in each. Those coming chiefly down the slackwater, after passing through the locks, are collected in fleets in front of the city, and moored in convenient and safe places to await freshets in the river to carry them out, called coal-boat rises. About twelve feet over the bars is considered a good coal-boat rise. They are then taken in tow by a steam coal-tug and floated to market below. Safety of moorage would seem, therefore, to be a matter of moment to the shipping filling that basin, and confined to it in low stages of water.

The defendant, being engaged in the coal trade, had a fleet of barges laden with coal lying moored at and fastened to one of the piers of the bridge, between five and six hundred feet from the southern shore, where a strong current prevails in a coal-boat rise.

[McGrew *v.* Stone.]

While so moored one of his barges sprang a leak, and sunk so rapidly after discovery of her condition that she had to be cut loose from her lashings to prevent her carrying others down. After sinking she was carried beneath the surface downwards, and across to the south side, where she lodged beneath the plaintiff's boats, some of which, when the water subsided, settled upon her and were sunk and injured. The action was for this injury. The cause of the leak which sunk the defendant's barge was unknown. All that is known of it is, that when recovered she was found to have her bow planks sprung at the knuckle of the rake, opening a seam of about half an inch. The doctrine of the court below was, that as the cause of sinking was unknown, it must be presumed it happened without the defendant's fault, and therefore that the place of moorage was immaterial, and to be excluded from the consideration of the jury. On this principle the danger of mooring to a pier out on the river where, on a rise, a strong current sets in accompanied by floating drift, was ruled out of the proof, and the court instructed the jury that their inquiry began with the conduct of the defendant when he discovered his boat was sinking; and their question was, whether he was then guilty of negligence or carelessness in regard to something which naturally conduced to the plaintiff's injury. The judge, with commendable fairness and clearness, planted himself squarely upon this position, both in his rulings upon the evidence and his charge, giving to the defendant every advantage he could ask for revision. The doctrine of the court negatives all duty in moorage, and throws upon others the risk of sinking there; as though it were inevitable accident, and not arising from any fault of the defendant in the selection of a place for his boats to lie. In argument it was said that no one but the bridge company could complain of his tying up his boat to their pier, and that it was as lawful to moor in the stream as at the shore. But did the defendant owe no duty to others who had the same rights of moorage in the river at that place? If others had the same right of mooring in that basin, and many vessels were there, if these coal-barges are large, unwieldy and difficult to be handled; if owing to their size and immense tonnage of coal they are liable to accident and readily to sink; and if the place of moorage was unsafe, and likely in case of sinking to produce injury to some one else, did not a duty lie upon the defendant to avoid this place, and to seek a safer one? The maxim *sic utere tuo ut alienum non lædas* clearly applies. Where a party is dealing with a subject full of risk, greater caution and diligence are required to prevent injury by reason of it; more care is required of him who stores powder or petroleum than of him who keeps coffee or sugar. The general rule is, that a man is answerable for the consequences of a fault which are natural and probable, and might therefore be foreseen by ordinary

forecast, while it is true that if his fault happen to concur with something extraordinary, and therefore not likely to be foreseen, he will not be answerable for the unexpected result. These principles ruled the opposite cases of Morrison *v.* Davis & Co., 8 Harris 171, and Scott *v.* Hunter, 10 Wright 192. In the latter case, which in principle resembles the one before us, it is said that the maxim *causa proxima non remota spectatur* is difficult of application, and that it is impossible to draw a line between causes of injury such as are sufficiently proximate and those too remote to be the foundation of an action.

The same doctrines were held by Black, C. J., in The City of Pittsburgh *v.* Grier, 10 Harris 54. The city of Pittsburgh having the control and receiving revenue from a wharf, suffered a pile of iron to lie near the water's edge for a length of time, forbidden by its ordinance, and a steamboat having landed at a reasonable stage of water, was forced by a rise in the river upon the pile of iron, to avoid which she was backed into the stream, and there was struck by a floating boat or raft and sunk. It was held that the city was liable for negligence in not removing the iron, and that the cause of injury by the floating body, in the stream, was not so remote as to shift the loss from the city. The Chief Justice saying, it is not the law that men are responsible for their negligence only to the extent of the injuries which they knew would flow from it. If it were, there could be no recoveries except for malicious wrongs.

In Beach *v.* Parmeter, 11 Harris 196, the present Chief Justice remarking upon an injury by collision, said that "for inevitable accidents, and for such as result from mutual negligence of parties, the law gives no redress; but when the injury comes from the exclusive negligence of one party, he cannot shield himself from liability by calling it an accident." The maxim *causa proxima non remota spectatur* means but this. We are not to link together as cause and effect, events having no probable connection in the mind, and which could not by prudent circumspection and ordinary thoughtfulness be foreseen as likely to happen in consequence of the act in which we are engaged. It may be true that the injury would not have occurred without the concurrence of our act with the event which immediately caused the injury, but we are not justly called to suffer for it unless the other event was the effect of our act, or were within the probable range of ordinary circumspection when engaged in the act.

But when we are engaged in an act which the surrounding circumstances indicate may be dangerous to others or their interests, and when the event whose concurrence is necessary to make our act injurious, is one which we can readily see may occur under these circumstances, and unite with the act to inflict an injury, we are culpable if we do not take all the care which prudent cir-

[McGrew *v.* Stone.]

cumspection would suggest to avoid the injury. This may be illustrated by the case instanced in criminal law, where a workman throws a stick of timber from the top of a building into a street. If it be in the unfrequented street of a small village, and he gives loud warning to any who might chance to pass by, he will not be held guilty of felonious homicide. But if he should cast it into the street of a populous city, where many are passing, and death ensue, he would be guilty of the homicide, notwithstanding his cry of warning. He cannot claim it to be an accident, but is taught by the circumstances themselves that the presence of passers is probable, and that it is improbable every one would hear his warning, or hearing understand it. He would be held to greater care, and to see that there were no one beneath. Accountability for civil injuries is even greater than for criminal acts. The cases of Morrison *v.* Davis & Co., and Scott *v.* Hunter, also furnish illustrations. In the former the injury happened because the boat chanced to be near a dam, when the flood came and carried it over, causing the loss of the goods. The alleged fault in the carrier was his using a lame horse, causing a delay which chanced to bring the boat to the dam when the flood overtook it, otherwise the dam, and with it the danger, would have been passed.

While it is evident the delay caused by the lameness was by its concurrence with the flood an element in the cause of loss, yet the occurrence of the flood, the immediate cause of injury, just then and there, was not within the circle of probable foresight. Hence the maxim *causa proxima non remota spectatur*, had its proper application. In Scott *v.* Hunter it was also the concurrence of a fortuitous flood with the act of the defendant which swept the boat over the dam; and yet he was held to be liable. Why the difference? It appears to be this. The act of the defendant was directly connected with the condition of the stream, which was a circumstance to give warning and lead his mind to perceive the danger. He wrongfully and unnecessarily continued to obstruct the entrance to the locks, and thereby held the plaintiff's boats out in the stream. He knew that others had an equal right to enter each in his turn. He knew that the stream was liable to floods by the fluctuations of the weather, and that the weather is unstable. He was therefore warned by the circumstances that an undue continuance in the entrance exposed the plaintiff's boat to danger if a flood came. He had reason to apprehend injury from his wrongful act. While the flood was therefore fortuitous in this instance, as well as in the former, yet he was reasonably led to know it might happen, and if it did, that his own act would be likely to injure those whom it exposed to the action of the swollen current.

The same principle may be applied to the case before us,

[McGrew *v.* Stone.]

according to the character of the facts which may be found by the jury. Had there been no harbor or basin filled by numerous boats, moored all along the wharf, and opposite shore, his mooring his fleet in the current exposed to accident there, and his want of wisdom or danger in mooring there, would not connect itself with probable danger to others. It would scarcely be expected that a sunken boat at the pier would be moved across the current to the spot where only a few boats lay, and lodge beneath them. It could not readily be held that his act would lead to probable injury to any but himself. But if he knew he was mooring his fleet of boats in a harbor contracted by low water into a limited basin, where many others lay,—if he knew that such barges filled with coal are ponderous, unwieldy, and difficult of control, are liable to injury, and easily sunken, and that the place of mooring, by reason of the strength of the current and floating drift, was one of danger, and most likely to cause such boats to sink, and also knew that this place, in case of the·sinking of his boats, was likely to prove to be dangerous to some of the many boats lying below, and that the; flood would come—for it was his purpose to await its coming, to carry him out—it could scarcely be held that these circumstances did not indicate to his mind the greater danger of mooring there, and if an accident should happen, the danger to which it would expose others. The injury under such circumstances would not be so remote that it ought not to be taken into account.

But it must be observed that these are inferences of fact which belong to the jury, whose province it is to determine what are the circumstances and the inferences of probability to be drawn from them.

We think, therefore, the court erred in withholding from the jury all the evidence as to the place of mooring the fleet, and in charging them that, whether the defendant was careful or careless, wise or foolish, in mooring at the pier, no negligence could be imputed to him, because the· cause of injury to his barge was not explained, and that the sinking of it in the absence of proof must be presumed to be without fault on his part. We are not to be understood as expressing our opinion upon the propriety or safety of mooring boats at the pier, or its probable consequences. There may be difficulty in determining the facts which can be solved only by the testimony of those who understand these matters well.

But we decide that the court erred in excluding all the evidence upon this branch of the case, and in confining the jury to a single view of it.

The judgment is reversed, and a *venire facias de novo* awarded.