## Needle et ux. v. Pennsylvania Railroad Company

*Richter, Lord & Farage*, for plaintiffs.
*P. Price*, for defendant.

BOK, P. J., April 7, 1952.—Mr. and Mrs. Needle boarded the race train from a track in Delaware and arrived at Broad Street Station, Philadelphia, at about 6 o'clock on the afternoon of June 5, 1950. They were on the last car of the second section, and the train was so long that the steps of this car came to rest above a brick extension of the regular wooden platform.

Judge, jury, parties, and counsel went to the station and walked to a point designated by plaintiffs as the spot where Mrs. Needle fell. The judge measured the height above the rail of both the wooden and the brick platforms, and found that both were higher than the rail. The brick, about an inch higher than the rail, was five to six inches lower than the wooden platform.

Mrs. Needle testified that as she and her husband walked to the end of the car to detrain, they became

separated by four or five people, she being ahead. A couple of people alighted before her, and as she reached the bottom step of the car, with both feet on it, she saw that the step was unusually high above the brick platform. She described it as being between two and one half and three feet. It was also compared with the top of a table in the courtroom, against which Mrs. Needle stood to measure it, and was said to be of about the same height: the top of the table proved to be 31 inches above the floor.

Mrs. Needle said that she felt unable to retreat up the steps because of the press of people behind her. She took hold of the handrail in her left hand, and with her handbag in her other hand attempted to dismount. Unable to reach the platform with her foot, she lost her balance and grip on the handrail and fell, striking her back against the step and falling on her coccyx on the brick platform. There was no landing stool and no railroad attendants near by.

Her most graphic description of the car, after saying that it was a coach and not a Pullman, was this, when shown a picture of a certain coach car:

"No, this is ridiculous. The car from which I fell looked like a Toonerville trolley compared to this. This is positively ridiculous. . . . That is exactly the only description I could give, it was so old-fashioned. . . ."

Her husband added that the car steps were "more or less iron rung steps."

After a verdict for plaintiffs, defendant filed motions for a new trial and for judgment n. o. v.

Taking up the latter motion first, it must be overruled on the authority of Delaware, Lackawanna and Western Railroad v. Napheys, 90 Pa. 135 (1879), and Miller v. Lehigh Valley R. R. Co., 290 Pa. 130 (1927). In the earlier case a verdict for plaintiffs was reversed because of erroneous instructions. The Supreme Court, by Mr. Justice Sterrett, went to great pains in indicat-

ing that plaintiffs should have known the danger and may well have been guilty of contributory negligence, but ordered a venire. The train was at its destination, the cars were at rest, it was daylight, and plaintiff husband was helping his wife alight when she was injured. The step, according to plaintiffs, was 25 to 29 inches high, and according to defendant, from 16 to 21 inches.

In the Miller case, verdict and judgment for plaintiff was affirmed. The step was 30 inches high, the steps were not over a platform but over dirt and stones beyond the platform, and it was daylight. The negligence averred was both the height of the step and the condition of the alighting space; in the instant case only the height of the step is averred as negligence.

There are certain differences in the facts. In the Miller case the train was stopped at a way station, which put plaintiff in danger of the train starting and carrying her past her destination if she tried to walk through the train to a point where she could have alighted on the regular platform. Also it is true that her view of the step was somewhat obscured by her own suitcase and by the man in front of her. In the instant case the train was in the terminus and Mrs. Needle had full view of the height she was faced with negotiating. Whatever force these distinguishing features may have is neutralized by the following bit of her testimony:

"Q. You say when you got to the bottom step of the car you looked and saw this unusual height we are talking about?

"A. That is right.

"Q. Did you make any effort to go back up the stairs and go to another car?

"A. Well, I turned my head and I looked behind me but I couldn't get through the people behind me.

"Q. Did you ask any of them to let you through?

"A. The way they were shoving you didn't have a chance to do that.

"Q. You weren't shoved, were you, or pushed?

"A. No, I wasn't, but I mean people were trying to get off and I didn't have any chance to."

As Mr. Justice Kephart said in the Miller case:

"We are not unmindful of the rule which requires passengers to have their eyes open and be on the lookout for dangerous situations in leaving a train. When a passenger, in the brief time allowed, examines the situation and believes he is able to make the descent, but errs through a misjudgment of the distance, he should not be held guilty of negligence for such error of judgment, especially under circumstances requiring at least a fair amount of haste. Everyone knows this to be so in leaving a train with passengers in the rear. Under all these circumstances, the question of contributory negligence was for the jury."

We are of opinion that under the facts as presented, Mrs. Needle's contributory negligence should not be declared as a matter of law. It is not for us to say that she should have screamed or made a scene and refused to take another step. This might have taken a strong-willed person. The test is that of the reasonable man, and he is supposed to be sitting on the jury.

Defendant's motion for judgment n. o. v. is overruled.

As for its motion for a new trial, we feel that the verdict was against the weight of the evidence and that the interests of justice require a resubmission. We take this action with an eye directly on the very recent cases of Decker v. Kulesza, 369 Pa. 259 (1952), and Beal v. Reading Co., 370 Pa. 45 (1952).

Plaintiffs' testimony has been outlined above, and there were no other eye-witnesses. For defendant a number of its employes were called. The train crew, excepting only the engineer and fireman, were called.

They testified, in sum, that the last car on the train was a P-70; that no other type of coach was used on the train or on any other race train; that the car number was 3533; that the train came in and discharged passengers on track 12, which was not the platform designated by plaintiffs; that all steps on P-70 cars are standard and that they knew nothing of any accident on June 5, 1950, until told about it later. The assistant train director testified that the train arrived at 6:02 p.m. on track 12, and produced a block record for the day. Three car inspectors and a claim agent testified that they inspected car 3533 in August 1950; that it had been in service since June 5th but was in the same condition and had had no major repairs, such as changing the steps, in the interval and that the bottom step of the car measured 13 inches above the top of the rail and nine inches above the brick extension platform of track 12. A photograph of car 3533 was offered in evidence.

This sharp conflict of evidence of course raises an issue of credibility that is peculiarly a jury question. It is not, however the kind of conflict that can be dismissed with a shrug merely because the jury has resolved it. We do not take the Decker and Beal cases to mean that no verdict can be overturned in the interests of justice unless the record reveals some outrage in the form of passion or prejudice or inflammatory speech or a lie exposed on cross-examination. Those cases must mean, in our view, only that the trial judge's sense of shock at a verdict is subject to appellate review. The trial judge, who is writing this opinion, was shocked by two ideas: (1) That the jury should believe that the Pennsylvania Railroad would run "Toonerville trolley" coaches, with steps 30 to 36 inches above the platform and "sort of iron-rung steps", from a race track in Delaware to a metropolis like Philadelphia in the year 1950; (2) that the jury

should believe that the Pennsylvania Railroad would falsify its records to show the train on another platform and a wholly different kind of car in use. The case is not serious enough to warrant such wholesale deceit. It is not a matter of one employe altering his records to save his job, and to require a group to testify as these men did for defendant would amount to suborning perjury as a matter of railroad policy.

The record goes well beyond the point that juries are apt to give verdicts against corporate defendants. To justify this verdict it is necessary to believe that there is perjury on the scale referred to, and that is where our sense of justice in the result fails us. We are all accustomed in the law to honest error and a little amiable lying, but this record stretches our judicial conscience beyond our power to rest easy.

The motion for a new trial is granted.