## White's Estate.

Argued October 30, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Don Rose,* with him *Robert A. Applegate, John Corcoran, Rose & Eichenauer, Charles A. Woods* and *Charles A. Woods, Jr.,* for appellants.

*Charles F. C. Arensberg,* with him *Christian Z. Schove, Charles C. Arensberg, Ella Graubart,* and *Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 25, 1940:

The question here is whether the cy pres doctrine can be invoked under the facts of this case. It arose on exceptions taken by the heirs of testatrix to the decree of distribution of decedent's estate by the Orphans' Court. The court applied the doctrine of cy pres. The appellants claim that the circumstances do not warrant its application.

The decedent was Julia F. White, who had only one child, a daughter, named Virginia. Virginia lived with her mother and was 49 years of age at the time of decedent's death. The daughter was mentally defective and had been so since birth. The mother became concerned as to how this daughter would be cared for after the mother's death. Among the institutions which she visited with the idea of having the daughter admitted

to one of them after her death was a home for old people located at Mars, Pa., and known as St. John's Lutheran Home. This home was established "for the reception and support of aged men and women." It did not ordinarily admit inmates who were mentally deficient. A committee from the Board of Regents of this home interviewed Mrs. White and observed the daughter, and Mrs. White visited the home. She approved of it as a prospective future home for Virginia, because there she would be with older and normal people, such as she had been accustomed to be with. The home agreed with Mrs. White to take care of Virginia for the balance of her life after Mrs. White's death and in consideration thereof the latter made the following provisions in her will: "Second: I have arranged that my daughter Virginia shall enter St. John's Lutheran Home of Mars, Penna., at my death. My executor shall take from my home whatever household goods, etc., shall be desired to comfortably furnish her room at the Home. . . . Fourth: I give to St. John's Lutheran Home . . ., One Thousand Dollars, as part of the compensation for taking care of my daughter during the remainder of her life." She then provided in the fifth paragraph of her will that the remainder of her estate should remain in trust and that the net income thereof "may be expended by the trustee from time to time for the purchase of clothing and any other comforts or pleasures which the trustee may believe Virgina would enjoy" and that "if on December 1st of each year there is a residue of income, the trustee shall pay such residue to St. John's Lutheran Home. At Virginia's death, the Trustee shall pay out of principal her burial expenses, and erect a stone like mine over her grave. The trust shall end and the remainder be given to St. John's Lutheran Home, of Mars, Pennsylvania, as additional compensation for taking care of Virginia."

This will was shown to the Board of Regents of St. John's Lutheran Home and on November 21, 1934, at a

special meeting of the Board a resolution was adopted assuring Mrs. White that the terms of her will "are satisfactory . . . and that the home will carry out its provisions."

Mrs. White died on April 28, 1938, and shortly thereafter Virginia was taken to St. John's Home. Two weeks later the Board of Regents requested the rescinding of their agreement, saying: "Virginia White is not an aged person nor does she fulfill the requirements of our home as to mental capacity." The home also renounced its benefits under Mrs. White's will. The trustee then took Virginia back to her former home and a little later she was placed in the Luther Home of Mercy at Williston, Ohio. The Orphans' Court gave the required permission and authorized the executors and trustees of the estate to maintain Virginia in the latter Home, and to pay for her care and maintenance there at a cost not exceeding $75.00 per month for a period of one year. At the end of that time the court made a second order authorizing the trustee to continue to maintain Virginia at that Home for a period not exceeding one year at not less than $125.00 a month. About a month later, on August 3, 1939, Virginia died. The trustee then filed its first and final account which came on for audit. At the audit counsel for all the heirs of the decedent appeared and made formal claim to distribution of the residuary estate taking the position that there was intestacy as to the entire residuary estate by reason of the action of St. John's Lutheran Home at Mars, Pa., in renouncing its bequest under the will and in refusing to comply with the terms of its agreement with the decedent.

Two hearings were held, after which the auditing judge decreed the entire balance for distribution to the Luther Home of Mercy at Williston, Ohio. The heirs and next of kin filed exceptions. These were dismissed by the court in banc and these appeals followed.

The basis for the court's decision was that "Mrs. White intended to establish and did establish a charitable trust." Having so found, the court declared that the next of kin had no standing to question the disposition of her residuary estate. The argument of next of kin is that Mrs. White made a contract with the St. John's Lutheran Home to take care of Virginia for a compensation, that no charitable gift was intended, and that the renunciation of the agreement destroyed all rights of any charitable claimant and all testamentary rights except Virginia's rights to the cost of care and maintenance. We think the language of the will clearly supports the contention of the next of kin.

The court below correctly said in its opinion: "A gift to a charitable or religious institution without stating the use to which it is to be put is a gift solely for the uses for which the institution was incorporated" (citing cases). In the instant case the gift to St. John's Lutheran Home *did* state the use to which it was to be put, that use being "compensation" for the care of Mrs. White's daughter.

Section 349 of the Restatement of Trusts sets forth the five methods of creating a charitable trust. The only method relevant to this case is the third one reading as follows: "A charitable trust may be created by . . . a transfer by will by the owner of property to another person to hold it upon a charitable trust." A charitable trust is defined in section 348 as "a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose."

. In the will before us we find no evidence of a testamentary intention to create a charitable trust. When the will became operative at the death of Mrs. White, the daughter had, according to the mortality tables, twenty-one years of life before her. There is nothing

in the record indicating that Mrs. White expected her daughter's demise less than 16 months after her own death. The sum of money testamentarily provided as "compensation" and as "additional compensation" to St. John's Lutheran Home for the care of the daughter was not disproportionate to the amount and duration of care reasonably expected by the testatrix. It is obvious that she did not look upon the sums of money she directed to be paid St. John's Lutheran Home as *gifts to charity*. We said in *Y. M. C. A. of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204: "Webster's New International Dictionary, 2d ed., defines a 'charity' (in the institutional sense) as 'an organization or institution engaged in the free assistance of the poor, incapacitated, distressed, etc.' Under this definition the characteristics of an organized charity are: First, whatever it does for others is done free of charge, or at least so nearly free of charge as to make the charges nominal or negligible; second, that those to whom it renders help or services are those who are unable to provide themselves with what the institution provides for them, that is, they are legitimate subjects of charity." Clearly Mrs. White in writing her will did not think of her daughter as ever being a subject of charity. She thought of her rather as a boarder and lodger at St. John's Lutheran Home and she provided in her will for compensation for that board and lodging and for nothing else. She might have entered into exactly similar contractual relations for her daughter's board and lodging with some individual.

Because one of the parties to a contract happens to be a charitable institution, the consideration provided to be paid under that contract, to the institution, does not create a charitable trust.

The decree is reversed and the record remanded for further proceedings in accordance with this opinion; costs to be paid by the estate.