## Bowen Estate

Before Klein, P. J., Bolger, Hunter, Lefever, Saylor and Shoyer, JJ.

*Otto Kraus, Jr.*, amicus curiae, exceptant.

*Taylor & Stern*, contra.

SHOYER, J., May 6, 1955.—Is the orphans' court warranted in the exercise of its equity powers in terminating a nonspendthrift testamentary trust where the possibility of additional issue is minimal?[1]

---

1. "While the Orphans' Court has not the general jurisdiction of a court of equity, yet within the sphere of its jurisdiction it is essentially such in its proceedings and in its decrees: Commonwealth v. Judges, 4 Barr 303. It is not, however, bound by the strict rules of equity practice, nor by the elaborate forms of equity pleading. Johnson's Appeal, 9 Barr 419": Culbertson's Appeal, 76 Pa. 145, 148.

The corpus consists of one small residential property appraised at $1,500-$1,800, with a gross annual income of $172, yielding but $60 net after payment of carrying charges and necessary repairs.

Since the death of the testamentary trustee in 1918, no successor trustee has been appointed or requested, management of the trust having been left in the hands of the local real estate agent, by mutual consent of the two surviving life tenants.

The trust arises under the home-made will of Sarah A. Bowen, dated April 12, 1884, and providing, inter alia, as follows:

". . . I want my two houses . . . [419 and 421 Canal St.] rented by my Executor and Administrator or by such person as he may appoint the rents after paying taxes and water rents and all needed improvements and interest on the mortgage to be placed at interest to pay off the mortgage when that is paid off and not before, I will that my son Wm. Bowen shall receive one-half of the clear income and my two grandchildren be paid the other half, as long as the said Wm. Bowen may live to receive it quarterly, at his death my grand-daughter to receive the income of No. 419 and my grandson, Wm. Bowen, Jr., the income of 421 on the death of either grandchild the survivor to receive the income of both houses unless the departed one has left child or children then they to receive their parents share after their death, if *their* is no children left then I bequeath both houses to the Messiah M. E. Church the proceeds to help pay off the indebtedness on said Church and I hereby appoint D. H. Bowen as my Executor and Administrator with full power to execute above will and to appoint his successor.

her

(Signed)    Sarah A.    X    Bowen    (SEAL)

mark

"Witness Present

(signed)    Alice C. Frost
(signed)    Hannah A. Berry"

Testatrix died in June 1895. By decree of this court dated October 19, 1895, premises 421 Canal Street was sold by the executor for the payment of decedent's debts, including the mortgage of $1,000. William Bowen, one of the life tenants, died in 1918. The two grandchildren, Ida and William, Jr., who were respectively 13 and 11 years old at the date of the will, have now petitioned for the termination of the trust, and their four surviving children, all sui juris, have joined with them. The church holding a contingent remainder renounced its "rights and legacy" in 1931 and waived "its claim unto Ida V. Alexander, nee Bowen, and William G. Bowen, her brother, grandchildren of the said Sarah A. Bowen, Deceased".

Following a hearing before Judge Lefever, termination was decreed and the trust principal ordered to be distributed equally to the two grandchildren conditioned upon the two life tenants and their four children signing a refunding bond "to protect against loss of any contingent remainderman who may subsequently have an interest in this estate." In addition, there being no trustee, Otto Kraus, Jr., Esq., was appointed amicus curiae and directed to file exceptions to the above decree.

Recently, our Supreme Court, in Bosler Estate, 378 Pa. 333, stated that:

"The principles of equity jurisprudence applicable to petitions to terminate trusts have been so often defined by this Court as to render extended discussion of the subject wholly unnecessary. If all the parties who are or may be beneficially interested in a trust are in existence and sui juris, if there is no ultimate purpose of any kind requiring the continuance of the trust, and if all the beneficiaries consent, a court of equity may decree its termination: Culbertson's Ap-

peal, 76 Pa. 145, 148; Harrar's Estate, 244 Pa. 542, 548, 549, 91 A. 503, 505; Stafford's Estate, 258 Pa. 595, 598, 599, 102 A. 222, 223; Wood's Estate, 261 Pa. 480, 483, 104 A. 673; Bowers' Trust Estate, 346 Pa. 85, 87, 29 A. 2d 519, 520; Restatement, Trusts, sec. 337. But if the purpose of the settlor in establishing the trust has not been fully accomplished, and if the settlor is deceased and therefore incapable of consenting, the trust cannot be terminated even though all the beneficiaries desire that it should be: Bowers' Trust Estate, 346 Pa. 85, 87, 88, 29 A. 2d 519, 520, and cases there cited."

Not only was testatrix, Sarah E. Bosler, deceased, but she had created a spendthrift trust "in order that I may feel that I have made provision for them which will assure to each one of them a support throughout his or her whole life, under any circumstances, and for the comfort that I will personally derive from such knowledge."

Our Supreme Court, after quoting the oft-repeated Pennsylvania rule that "spendthrift trusts can have no other justification than is to be found in considerations affecting the donor alone"; held that the purpose of the settlor in protecting the fund from creditors was paramount and the lower court erred in permitting allowances from corpus to the life tenant solely on the equities which favored the life tenant. In the absence of statutory authority, equitable considerations moving toward the life tenant alone were held to be insufficient.

In the light of the Bosler decision, two questions immediately arise: First, can the trust be terminated without the consent of its creator now dead; second, can it be terminated without the joinder of unborn contingent interests? Unless petitioners can satisfy this court that there are moving equities, which would

justify us in terminating the trust without the consents of such parties, the petition must be declined. In reaching a decision we have been greatly aided by the exhaustive briefs and able arguments of counsel.

Irrespective of the death of settlor, petitioners move for the termination of the trust in favor of the two surviving life tenants under the "failure of purpose" doctrine.[2] They allege several reasons, to wit, that the sale of one of the two properties immediately after testatrix's death for the payment of her debts defeated her plan to give to each of her grandchildren the entire net proceeds of one house (after the mortgage had been paid off out of net rents), and that the increase in carrying charges of some 400 per cent, together with the drop in the purchasing power of money since testatrix's death, makes the small income netting about $60 per year of even less value to the beneficiaries. To these troublesome economic conditions may well be added the current problems of rent controls and the new city building code, which latter will, undoubtedly, require expensive improvements in this aged property in the immediate future.

It is also apparent from reading the will that testatrix's main consideration was for her son, now deceased, and her two grandchildren who in 1884 were

2. The doctrine of "failure of purpose" is an outgrowth of those instances where the surviving widow by her election has defeated the dominant purpose of testator in creating the trust and there is no controlling reason in keeping it alive for purposes of distribution: Loew's Estate, 291 Pa. 22, 29; In re Disston's Estate, 257 Pa. 537, 542. In employing this doctrine for the purpose of terminating these small trusts, yielding so little to the life tenant, the primary object of testator's bounty, courts of equity have ascribed to settlor an intention of providing material support which, while not always spelled out, is nonetheless readily inferred from the attendant circumstances.

but 13 and 11 years of age.[3] As was so well stated by Judge Holland in Honeywell Estate, 70 D. & C. 472, 474:

". . . It has for some time been established that where the income beneficiary is the primary consideration of testator or settlor with the view of providing the comfortable maintenance of such primary beneficiary, and, on account of the insignificance or inadequacy of the income to accomplish this purpose, the intent of testator or settlor is frustrated, the court will terminate the trust and award the principal to the income beneficiary in order to enforce that intent, regardless of who are the remaindermen, . . . of testator or settlor: Auchu's Estate, 38 D. & C. 33 (1939), supported by A. L. I. Restatement of the Law of Trusts §336, p. 1019; Miller's Estate, 33 Berks 89 (1940), and Posey Estate, 52 D. & C. 127 (1944)."

To the above cited authorities may be added Horst Estate, 86 D. & C. 528; Holmes Estate, 66 D. & C. 612; Estate of William Sowerly, O. C., Philadelphia County, October term, 1897, no. 140 (adjudication of Ladner, J., October 31, 1949); and see Exley Estate, 67 D. & C. 508. As so aptly put by the learned hearing judge:

"The instant case is a classic illustration of a trust in which the failure of purpose doctrine applies. A trust of $1,500 which produces a net income of only $60 per year is cumbersome, futile, and of benefit to no one."

To this we may add that the legal maxim, "de minimis non curat lex", applies to a trust which serves no useful purpose. Legal reasoning should not be

---

3. ". . . in nearly all instances of long continuing trusts, the life tenants are the primary objects of the bounty of testators. . . .": Nirdlinger's Estate (No. 2), 327 Pa. 171, 173.

strained to perpetuate something that is of no use to anyone.

As to the problem created by lack of consent of possible contingent beneficiaries yet unborn,[4] we believe that the learned hearing judge treated this adequately by providing for the entry of an indemnity bond by the two life beneficiaries and their issue now living.

The law has long recognized a conclusive presumption that the possibility of issue continues so long as life itself. Thus in Dickson Estate, 378 Pa. 48, 50, our Supreme Court has recently said:

"For centuries the law was well settled that 'A possibility of issue is always supposed to exist in law . . . even though the donees be each of them an hundred years old': 2 Blackstone's Com. 125; *List v. Rodney*, 83 Pa. 483, 492. See to the same effect: *Austin's Estate*, 315 Pa. 449, 451, 173 A. 278; *Sterrett's Estate*, 300 Pa. 116, 123, 150 A. 159 (the life tenant was 78 years of age) ; *Straus's Estate*, 307 Pa. 454, 459, 161 A. 547."

The Supreme Court there did not deem it necessary to decide this question and we do not think a decision is necessary in this case. However, we note the follow-

---

4. "The restrictive effect of this requirement is unfortunate in that it permits the remote objects of the conveyor's bounty to frustrate the enjoyment of the estate by the immediate objects of his bounty. For it has been said that the life beneficiaries are generally those for whom a trust is primarily designed.

"The inequity of such a result is demonstrated by the fact that the remainders whose existence could frustrate the termination may well have been created solely in order to divest a settlor of all of his reversionary interest for tax purposes, or merely for the purpose of naming some ultimate remaindermen after the death of all of the primary objects of the bounty of the settlor": Lefever, "Termination of Trusts in Pennsylvania," 96 Univ. of Penna. L. R. 305, 311 (1948).

ing: William G. Bowen, Jr., testified that he was 82 years of age, that his wife died in 1947, and that now and for some time in the past he has not been "physically able to have children". The younger of his two daughters is 51. Ida B. Alexander testified that she was 84 years of age, that she was married and living with her husband, that she "went through the change of life" more than 45 years ago, her youngest child is 50, she has had no children "in the last 50 years", and, therefore, she now and for many years past has been incapable of having issue.

Several of our lower courts have made findings of sterility on the basis of medical testimony of such convincing quality as to be well nigh conclusive.[5]

This record lacks medical evidence of any sort, only the testimony of the two octogenarians being submitted. It is likewise devoid of the statistics relied on by Judge Augustus N. Hand in City Bank Farmers Trust Co. v. United States, 74 F. 2d, 692-93-94 (C. C. A. 2nd, 1935), as follows:

---

5. In Bosler Trust, 3 Fid. Rep. 635, the lower court (Judge Gearhart) accepted testimony as to the removal of the vas deferens with corroborative medical testimony as to the nonexistence of spermatozoa in life tenant's semen as establishing complete sterility; in Kelby Estate, 80 D. & C. 1, Judge Lefever accepted as conclusive the testimony of an internist, a genito-urinary specialist, and a general practitioner, that after exhaustive physical and laboratory tests they had found the male life tenant to be both "impotent and sterile"; in Leonard's Estate, 60 D. & C. 42, Judge Richards accepted expert medical testimony that by reason of life tenant's age, 57, and the atrophy of her sexual organs, she was unable to conceive or bear a child; see also Estate of Joseph Hess, O. C. of Philadelphia County, June 3, 1940, (April term, 1884, No. 533) (reviewed in Fiduciary Review, August 1940), where Judge (now Mr. Justice) Stearne accepted testimony of a gynecologist that the two life tenants, a 79-year-old childless widow and a 76-year-old spinster, could not possibly bear children, the expert's opinion being based on his examination of the life tenants and his experience as a physician covering many years of practice.

"It is true that the medical books contain a trifling number of cases, how well authenticated we do not know, where women 59 years of age and over have borne children. But, since verification of offspring to women of 55 years and over began to be attempted by the United States Department of Commerce, there have been from the years 1923 to 1932, inclusive, no recorded births to such women. During that period, the total number of births was 20,389,873, without a single child having been borne to a woman of 55 years or over. In view of the statistics, we may conclude that the chance that the life tenant here would have issue after the death of the testator was negligible.

". . . the statistics show that in the case of a woman between 50-54 years of age there is the slight chance of .0001 that she may have children. Therefore, while it is not necessary to say that possibility of issue must be treated as extinct among women between 50 and 54 years of age, it seems clear that those beyond the latter age are to be regarded as wholly past childbearing . . . The certainty that a woman who has reached 50 years will not bear children is far greater than that which attends most other human affairs and to which rules of law have to be made and applied."

The most frequently quoted decision in Pennsylvania on the conclusive presumption of fertility is List v. Rodney et al., 83 Pa. 483, 492, where the court, in speculating on the origin of the rule, stated that

". . . Whether the rule rests upon the indelicacy of the acts to which such an inquiry might lead, or to the great uncertainty of arriving at an accurate conclusion, we know not; but certain it is, the rule has stood the test of time, and received the sanction of ages. No case has been cited showing that it has ever before been questioned in Pennsylvania. Nature has fixed no certain age, by years, at which a child-bearing capacity shall begin or end. Any conjecture

based on age is too doubtful and uncertain to result in any reliable conclusion. It was well said in Jee v. Audley, 1 Cox 324, 'if this can be done in one case it may in another, and it is a very dangerous experiment, and introductive of the greatest inconveniences to give a latitude to such sort of conjecture."

Today we are more concerned with the accuracy of the rule than its origin or the reasons advanced in support of it. Initially, we agree with Judge Hand that "The statement . . . that 'nature has fixed no certain age, by years, at which a child-bearing capacity shall begin or end', is quite unfounded when applied to extremes either way"; City Bank Farmers Trust Co. v. United States, supra, at 694.

Other objections that have been advanced against diluting the rule are that women might resort to surgical operations, that confusion might result as to real estate titles and that there is maximum value in uniformity. True it is that these objections are eliminated by holding the presumption conclusive under all circumstances. Hardships inevitably result, however, from the failure to grant equitable relief in individual cases and property is unreasonably tied up for three quarters of a century and longer. Inasmuch as modern science makes determination of the fact of sterility comparatively easy, and birth statistics, by their very volume, produce the highest degree of accuracy, it is flying in the face of common sense to dispose of individual cases by holding the presumption conclusive. Such judicial dogma neither facilitates justice nor promotes respect for it.[6]

In recent years our appellate courts have commenced to reëxamine some of their earlier statements with

---

6. For terse, sardonic comment on the conclusive presumption against sterility, see Polen, "Decline & Fall of the Fertile Octogenarian", 26 Temple L. Q. 148 (1952).

regard to the nature and effect of presumptions.[7] Thus, Mr. Justice (later Chief Justice) Maxey, in Watkins v. Prudential, 315 Pa. 497, 501, approvingly quoted from Wigmore that ". . . there cannot be such a thing as a 'conclusive presumption' ". In that scholarly opinion, which is truly a landmark in the Pennsylvania law of evidence, Justice Maxey has carefully analyzed presumptions and has well said that to have probative value they must be "firmly based upon the generally known results of wide human experience" (p. 504). Certainly the propositions of law set forth in that opinion, and in others that have followed in its wake, warrant the belief that a trial court in deciding the question of possible future remaindermen should welcome either medical, or statistical evidence, or both, before extending continued fertility even unto octogenarians.

As stated above, this case lacks both medical proof as well as statistics tending to prove sterility. However, absence of such evidence has not stopped our Supreme Court from approving the action of lower courts in terminating trusts and directing the filing of refunding bonds[8] to provide for the slim possibility of

---

7. See Levin, "Pennsylvania and The Uniform Rules of Evidence: Presumptions and Dead Man Statutes", 103 Univ. of Penna. L. R. 1, 10, et seq. (1954). Professor Levin notes that while there is much Thayer-Wigmore language in recent Pa. decisions, our courts have never gone to the extent of holding that, like "bats or bees", presumptions disappear upon the introduction of opponent's evidence. Presumptions, while not evidence, will still sustain plaintiff's burden of proof, unless the jury deems the contrary evidence to be *credible*. See also Levin, "The Impact of the Uniform Rules of Evidence on Pennsylvania Law," 26 Pa. B. A. Q. 216, 219, et seq. (1955).

8. Origin of the requirement of refunding bonds may be found by analogy to the procedure authorized by the Acts of 1834, P. L. 73 sec. 49; 1871, P. L. 269 sec. 1, reënacted in sec. 23 of the Fiduciaries Act of 1917, 20 PS §635, now repealed.

future issue. Termination has been decreed without
reliance on the "failure of purpose" doctrine. Thus,
in Estate of Thomas Mellon, 16 Phila. 323, affirmed
by our Supreme Court under the title, Appeal of
James E. Gowen, Tr., 106 Pa. 288, Judge Penrose, one
of the most eminent jurists in the history of the Phila-
delphia Orphans' Court, observed (page 323 of 16
Phila.) :

". . . it is a conceded fact that though in law there
is a possibility that the daughter, (56 years old) not-
withstanding the circumstances mentioned by the audi-
tor, may still have issue, physically speaking such a
thing is most unlikely to occur. It is well settled that a
court of equity will not suffer an estate to remain tied
up where the only obstacle in the way of distribution
is a contingency of this character. It is true that Lord
Coke states that in his 'time a woman above three
score yeares old hath had a childe' (Co. Litt. 40, a.),
and even in modern times similar instances are not
unknown: Taylor's Med. Jurisp. 593; but they are so
out of the course of nature that courts of equity will
only consider them in determining the sort of security
to be required from the distributees. . . ."

In Brooke's Estate, 15 Dist. R. 137, affirmed per
curiam on abstracted opinion of Judge Penrose, 214
Pa. 46, there was a petition by the substituted trustee,
life tenant, and her brother (her sole next of kin), to
terminate a testamentary trust under the Price Act
and for leave to sell the real estate at private sale.
Testator had created a trust for his daughter, Emeline,
for life, remainder to her children "as may then be
living" and in default of any children "then living"
to daughter, Sarah Jane. Emeline had a child living
at testator's death, who died following the death of
Sarah Jane. Emeline was 66 years old at the time of
presenting the petition. In granting the petition, Judge
Penrose observed (at page 139 of 15 Dist. R.),

"Practically, therefore, the *cestui que trust* for life and her brother of the whole blood are the only persons having an interest in the estate, and the trust may be terminated and the estate sold at their instance (Culbertson's Appeal, 26 P. F. Smith, 145; Sharpless's Estate, 151 Pa. 214) ; and while there is, in law, always a possibility of the birth of issue, no matter what may be the age of the proposed progenitress, equity, which is part of the law of Pennsylvania, will not permit the withholding of rights when the only obstacle to their enjoyment is a contingency which, in the ordinary course of nature, cannot take place—as that a child shall be born by a widow past the age of child bearing, and where even that possibility may be provided for by requiring security such as will, under all the circumstances of the case, be deemed adequate (Brown v. Pringle, 4 Hare, 124; Edwards v. Tuck, 23 Beav. 268; Mellon's Estate, 16 Phila. 323; s. c., on appeal, 10 Out. 288, etc.)—the mere refunding receipt of the persons entitled being regarded as sufficient to protect the interests of such unborn children: Mellon's Estate, Gowen's Appeal, supra."

See also Daly's Estate, 26 Dist. Rep. 299.[9]

In the instant case, the possibility of additional issue to these life tenants being so slight, and the possibility of their interest exceeding a few hundred dollars being even less, the equities demand a practical solution such as that afforded by the refunding bonds ordered by the learned hearing judge.

As additional reasons for our terminating this trust, it is contended that this will violates our rule against perpetuities, and also our statute against accumula-

---

9. In Austin's Estate, 315 Pa. 449, 451, many of these cases were noted with apparent approval, while in Dickson Estate, 378 Pa. 48, 51, they were cursorily disposed of in a footnote as "exceptional cases", which is scarcely in keeping with the eminence of the jurists who decided them.

tions, thus resulting in an intestacy under which the two grandchildren would inherit in any event. We prefer to base our decision on the reasons set forth above.

The exceptions are dismissed and the decree of the learned hearing judge is confirmed absolutely.

Bolger, J., dissents.

## DISSENTING OPINION

BOLGER, J., May 6, 1955.—Courts have recently been terminating trusts with such frequency that some danger signals should be raised in addition to those expressed in Bosler's Estate, 378 Pa. 333. The zeal with which existing hardship of the beneficiaries, or the difficulty of administering the trust is utilized as the fundamental reason for termination, has led to courts seizing upon any possible basis of equity to accomplish the purposes. Reflection reveals that in some instances the grounds are really tenuous or are actually without foundation.

We should be more concerned with stare decisis. This trust arose long before the enactment of the Estates Act of 1947, 20 PS §301.1, which is not retroactive and, therefore, has no application to this case: Bosler's Estate, supra. Will the instant case and the other related decisions, more particularly the several reasons assigned in support of them, rise to haunt this and other courts in the future? We might feel that this decision is sui generis, but how many other courts will so regard it?

Hearing judges must appreciate the danger involved in the ex parte aspects of these cases. The trustee is complacent and all of the parties who are sui juris agree with little deference being paid to contingent interests, real or unascertained. The proceeding is, therefore, not an adversary one. This situation offers a perfect opportunity for sympathy to play a major role in influencing the court's action. In this case that

element was largely eliminated for the court en banc by the appointment of an amicus curiae, who served without compensation.

No quarrel can be found with the principle that we have the equitable power to terminate small trusts where the intention of testator has been frustrated and the continuation of the trust will serve no useful purpose. However, that principle can only be applied when the appropriate legal principles involved in will construction result in the ascertainment of testator's purpose in the first instance.

In Kelby Estate, 80 D. & C. 1, Judge Lefever in an adjudication stated, inter alia, that testator "had an intention to make adequate financial provision for the income beneficiary". Whether or not that was actually testator's intention in that case, there is no basis for such a legal conclusion here. Consideration of the hardship in which present life tenants find themselves cannot support a termination any more than does the meager amount of the res (Bosler Estate, supra) or of the longevity of the trust (since no serious consideration has been paid either in the adjudication or in the opinion to the allegation that the trust offends the rule against perpetuities). Any hardship here has not proceeded from testatrix's benefaction; the estate was meager when she died. This is no valid reason for destroying this trust. The plain language of this will is unquestioned (Jury Estate, 381 Pa. 169) and it should be effectuated. The majority of the court, instead of putting themselves in the armchair of testator (Jackson Estate, 337 Pa. 561), take a purely pragmatic position and attempt to put testatrix in their armchairs and speculate that if she were alive today, she would want the trust terminated. This action partakes of an attempted cy pres, which doctrine has no application to private trusts: White's Estate, 340 Pa. 92.

Whether a trust has failed or not is a question of fact, in the ascertainment of which all circumstances must be reviewed. Even when a testator's purpose is to make "adequate" provision for life tenant, it is testator's and not the court's evaluation of what testator meant by the term "adequate". Many of the cases have employed the philosophy of the Estates Act of 1947, supra, which legalizes the termination of spendthrift trusts of $25,000, and under, as a basis for decision. That philosophy might be grossly misleading because a judge's notion of "adequate" provision for a life tenant under the present rate of return might require principal of any sum up to $200,000. The donor might actually desire to honor life tenant and to be favorably remembered by him for so doing by providing small periodic sums of income, even pittances. We should not be so material-minded as to dishonor such or other like purposes. Are we to lay down a rule that would sustain a rich man's trust but would destroy a poor man's trust? Where is the line to be drawn and who is to draw it, if not testatrix?

The part of the majority opinion dealing with the extinction of the possibility of issue is particularly open to objection. It is pure dictum and, therefore, has no force. The hearing judge found the evidence on the subject insufficient and it was not pressed by the parties before the court en banc. The essential findings of fact cannot now be made because they must be based upon evidence which does not exist. The citation of Kelby Estate, supra, with approval is not only unnecessary to the decision, but its authority is objected to. The long line of binding precedents to the contrary, the last being Dickson's Estate, 370 Pa. 48, 50 constitute the first reason. Another is that it finally ignores the impact of the conclusive presumption of law that a child born during wedlock is presumed to be legitimate. In McKee Estate, 378 Pa. 607, 108 A. 2d 214,

the only parties to appeal to the Supreme Court were the offspring of a patently illegitimate child of John McKee. Our ruling was that the child having been born during wedlock was presumed legitimate and his offspring were, therefore, proper parties in the proceeding.

The contingent remainderman, the charity, has apparently been very obliging by renouncing its interest. Whether a charity can renounce a legacy, it is unnecessary to decide. However, that does not necessarily indicate that the contingent interest which it renounced disappears entirely from the consideration of the court. Whether or not it should be cy presed is a question which the auditing judge or the majority opinion-writer should pass upon. No such conclusion appearing, it is error to gloss over this interest so lightly.

For these reasons the trust should not be terminated and the petition praying for its termination should, therefore, be refused.