## Beal, Appellant, *v.* Reading Company.

Argued January 9, 1952. Before DREW, C. J.,
STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*William F. Quinlan,* with him *Victor Frey,* for
plaintiff.

*John R. McConnell,* with him *Morgan, Lewis &
Bockius,* for defendant.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 1, 1952:

In this trespass action for personal injuries both sides have appealed. Plaintiffs' appeal is from an order granting a new trial, following a jury's verdict for plaintiffs. The refusal of defendant's motion for judgment *non obstante veredicto* is the cause for the other appeal.

Where a defendant, as here, moves not only for a new trial but for judgment n.o.v., he places himself in rather an anomalous position. If his motion for a new trial is granted, it automatically disposes of the motion for judgment n.o.v. But this situation frequently has been before this Court. On appeal from an order of a trial court granting a new trial and discharging a motion for judgment *non obstante veredicto,* the appellate court will not reverse and enter judgment for defendant, unless it is convinced that the court below abused its discretion in awarding a new trial, especially where the appealing party is the one who prayed for and was awarded a new trial: *Tupponce v. Pennsylvania Railroad Company,* 358 Pa. 589, 57 A. 2d 898. See also *Fornelli v. Penna. R. R. Co.,* 309 Pa. 365, 369, 164 A. 54; *Kuhler v. Harrison Construction Co.,* 361 Pa. 100, 62 A. 2d 853; *Streilein v. Vogel,* 363 Pa. 379, 69 A. 2d 97; *Carroll v. Pittsburgh,* 368 Pa. 436, 84 A. 2d 505.

Before considering defendant's motion for judgment n.o.v. it is therefore necessary to pass upon the question whether defendant's motion for a new trial was properly granted. In *Tupponce v. Pennsylvania Railroad Company,* supra, Mr. Chief Justice DREW (then Mr. Justice DREW) accurately and concisely stated the rule, page 590: " ' "We will not reverse an order awarding a new trial unless a palpable abuse of discretion on the part of the trial judge is disclosed or unless an erron-

eous rule of law, which in the circumstances necessarily controls the outcome of the case, is certified by the trial judge as the sole reason for his action": Marko v. Mendelowski, 313 Pa. 46, 169 A. 99': Girard Tr. Co. v. Geo. V. Cresson Co., 333 Pa. 418, 422, 5 A. 2d 221."

The trial judge has not stated that the sole reason for the grant of a new trial was his erroneous ruling of law in the trial, and no such claim is made. We therefore are concerned with but a single question, viz.: was it a palpable abuse of discretion for the court below to grant a new trial upon the sole reason that *"the interests of justice require a retrial of the case"*?

In *Bellettiere v. Philadelphia,* 367 Pa. 638, 81 A. 2d 857, Mr. Justice STERN made a comprehensive analysis of these principles. In a footnote he has collected a host of cases supporting them.

Where the *reason assigned* for the grant of a new trial involves the exercise of discretion, ordinarily the order of the trial court will not be interfered with, in the absence of palpable abuse of power: *Class & Nachod Brewing Co. v. Giacobello,* 277 Pa. 530, 121 A. 333, cited with approval in *Bellettiere v. Philadelphia,* supra. But as stated by Chief Justice MAXEY in *Jones v. Williams et al.,* 358 Pa. 559, 58 A. 2d 57, p. 564: "While this Court usually supports the action of the trial court in granting or refusing a new trial we do not entirely abdicate our reviewing functions in such cases. This Court, too, has the duty to determine from the record whether or not the jury's verdict was so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative so that right may be given another opportunity to prevail." This quotation was repeated with approval in *Decker v. Kulesza,* 369 Pa. 259, 263, 85 A. 2d 413.

One who seeks to reverse the action of a trial court in granting a new trial assumes a heavy burden. Ap-

pellate courts are reluctant to interfere with such exercise of judicial discretion. It is only where such discretion has been exercised capriciously, arbitrarily, improvidently or has been palpably abused that we will reverse. A trial court, however, must give reasons for its action, otherwise an appellate court would be unable to review such action. Mere conclusions such as "interests of justice" are insufficient. All judicial process necessarily is in the interest of justice. Such conclusion, in the absence of amplification, could well serve as a cloak or shield for abused judicial discretion.

Since the learned court below in the present case failed to give its reasons for granting defendant's motion for new trial, stating only its conclusion that "the interests of justice require a retrial", we are obliged to examine the entire record to determine whether any valid reason exists for disturbing the jury's verdict: *Bellettiere v. Philadelphia,* 367 Pa. 638, 81 A. 2d 857; *Carroll v. Pittsburgh,* 368 Pa. 436, 84 A. 2d 505; *Decker v. Kulesza,* 369 Pa. 259, 85 A. 2d 413. We make this study unaided by any comment from the trial court on credibility of witnesses, quality of testimony, or any of the many other matters which might have guided the court in exercising its judicial discretion. So far as the record reveals, no facts are in dispute, and no issue of credibility or weight of testimony exists which requires the submission of this case to another jury. We will therefore reverse the order granting a new trial.

Defendant's appeal from the order refusing its motion for judgment n.o.v. raises the question whether the established facts reveal, as matter of law, that defendant was not responsible for plaintiffs' injuries.

Angelina Beal, and her husband, John Beal, the plaintiffs, sued the Reading Company, the defendant,

to recover damages for injuries suffered by the wife-plaintiff on December 24, 1942, caused by a fall into a hole located within the lines of a state highway that passed over a cut and bridge over and across the right of way and tracks of the defendant railroad company.

Over ninety years ago, in 1857, the defendant, on its own land and right of way, made a cut eighty-seven feet in width and forty feet in depth through which it laid its railroad tracks, and over which it has since actively operated its railroad. Fifty-six years after such construction, in 1913, the Commonwealth of Pennsylvania condemned for a state highway a fifty foot wide strip of land running approximately at right angles to the defendant railroad's right of way on which it built a state highway; the state constructed a bridge with a span of eighty-seven feet over the cut; the cartway over the bridge was seventeen and eight-tenths feet wide; and a footwalk approximately six and one-half feet wide on the west side of the bridge was separated from the cartway by a low sturdy metal wall. Along the edge of the highway approaching the bridge, at the top of the railroad embankment, the highway department constructed a guard fence composed of two wire cables supported by wooden posts. Since only thirty of the fifty feet condemned by the state are actually paved or used for highway purposes, land owned by the state extends about fifteen feet beyond the guard fence onto the cutout constructed by the railroad company. The guard fence is thus well within the boundary of land owned and maintained by the highway department. The hole into which plaintiff stepped was located about fifteen or twenty feet from the northeast corner of the bridge, on the highway side of the guard fence. It was about two or three feet deep and was the upper extremity of a washout which extended all the way down the bank of the railroad cut. Plaintiff was injured

when she moved back from the traveled portion of the highway to avoid a passing automobile, stepped into the hole, slipped under the guard fence, and fell to the foot of the embankment. It is undisputed that the cause of the hole in the highway was the erosion of the surface by rainwaters washing down the embankment.

The chief theory of defendant's liability advanced by plaintiffs is that the defendant railroad owed a duty of lateral support to the highway. It is argued that such erosion of the surface constitutes a subsidence and demonstrates defendant's failure to provide lateral support to the highway. Such argument, while novel and ingenious, is unsound.

An adjoining landowner incurs liability only by *withdrawing* lateral support. He is under no duty affirmatively to *supply* lateral support. See Restatement, Torts, sec. 817 et seq. The force of this rule as it applies to highways is set forth in 3 Nichols on Eminent Domain (3rd ed.) sec. 9.221 [1], Limitation upon use of adjacent land : ". . . after the taking the owner cannot lawfully injure or destroy the public work erected thereon, even by a *use* of his own land that would be lawful as against an adjoining owner. . . .

". . . the establishment and construction of a highway or a railroad imposes upon adjacent land the burden of supporting the completed structure and the vehicles travelling thereon, so that *the adjoining owner cannot lawfully remove such support* by excavations upon his own land and impair the safety or convenience of travel upon the public easement." (Emphasis supplied)

A landowner incurs no liability for subsidence of his neighbor's land so long as he does nothing to change the contour of his own property. It is true that the defendant railroad company over ninety years ago did

change the natural contour of its land when it dug this cut, but it did so at a time when it held title to all the land in question. When the state later condemned a portion of the defendant's land for a highway, it only acquired the right to have Reading Company refrain from interfering with the lateral support for the highway provided by the land *as it then existed.* There is no evidence that the terms of the condemnation proceeding required the company to take any affirmative action to *provide* lateral support. For this reason, *Ligonier Valley Railroad Company v. Public Service Commission,* 83 Pa. Superior Ct. 502, relied on by plaintiffs, is inapposite. There the Public Service Commission had, pursuant to proper statutory authority, imposed upon the railroad company the obligation of paying for the bridge over its right of way and *maintaining the same.* No such obligation is here involved. A fresh act of condemnation would be required to impose it. It has always been the rule that a sovereign acquires by condemnation only those rights for which it pays. Thus in *Pennsylvania Coal Company v. Mahon,* 260 U. S. 393, 43 S. Ct. 158, the Supreme Court held unconstitutional, as an improper exercise of the police power, a Pennsylvania statute forbidding mining in such a way as to cause subsidence when the right to mine without providing support had been expressly reserved in the deed to plaintiff. At page 415 Justice HOLMES said for the court: "The rights of the public in a street purchased or laid out by eminent domain are those that it has paid for. If in any case its representatives have been so short sighted as to acquire only surface rights without the right of support, we see no more authority for supplying the latter without compensation than there was for taking the right of way in the first place and refusing to pay for it because the public wanted it very much."

Since there is no evidence here that the condemnation imposed an affirmative duty on the railroad company, it cannot be held liable for any subsidence of the highway caused by water running down the embankment unless plaintiff demonstrates that the company so altered the condition of the bank *after condemnation* as to cause the erosion. This record is absolutely barren of any such evidence.

It is true that plaintiffs' witness, Joseph Trunk, at first testified that the erosion began at the bottom and worked its way up the side of the bank and that from time to time the railroad company removed the accumulated dirt from its right of way. If this were true, then the jury might have been permitted to infer that the removal of this dirt from the tracks was the chief cause for the erosion. But on cross-examination the witness admitted he only *surmised* that this was the way the erosion occurred. He said: "But when I saw it, the gully was there. . . . It looks as though it formed at the bottom first because there was more dirt at the bottom than there was at the top." With the witness's testimony thus nullified by his own admission, there is nothing in the record to negative the conclusion from common experience that this erosion began on land owned by the State as rainwaters poured over the lip of the bank and carried loose dirt along. Such conclusion is supported by the fact, introduced into evidence without objection, that the defect was later cured by a stone wall erected by the highway department at its own expense at the *top* of the bank. Plaintiffs cannot escape the force of Reading Company's argument that they produced no evidence to show that anything which happened at the *bottom* of the embankment on railroad property could have caused the erosion at the *top* of the state highway. Thus the plaintiffs have failed to sustain their burden of proving a causal connection be-

tween the hole in the highway and any activity of defendant. Defendant is therefore entitled to judgment n.o.v.

Plaintiffs' failure to establish causation disposes of their other argument, viz.: that defendant is responsible for maintaining a dangerous condition close to the highway. Since plaintiffs did not show that defendant caused this hole in the highway, *McCarthy v. Ference*, 358 Pa. 485, 58 A. 2d 49, relied on by them, is inapposite. In that case and the many cases cited therein, it was established that defendants had done something on their own land to cause a dangerous condition on a public highway.

Since we have determined that plaintiffs failed to establish a prima facie case, it becomes unnecessary for us to pass upon the wife-plaintiff's alleged contributory negligence.

The order for new trial and order dismissing defendant's motion for judgment are reversed and judgment is here entered for defendant *non obstante veredicto*.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Mrs. Angelina Beal, on December 24, 1942, fell into an irregularity on the surface of Limekiln Pile in Edgehill, Philadelphia County, and rolled over an embankment to the railroad tracks of the defendant company some 40 feet below.

Practically everyone connected with this case has referred to the irregularity into which Mrs. Beal fell as a *hole*. The photographs in evidence plainly show that it was not a hole. A hole has a certain configuration, and, no matter how lopsided or distorted, it must have a circumference. The outer edges of a hole, starting away from any given point must eventually meet

again. Otherwise, the depression involved is not a hole
but a ditch, gully or ravine, depending on its size and
the terrain involved. Generically it would be a de-
clivity.

If the hollow space into which Mrs. Beal stepped
was a hole, it is more difficult for her to establish a
case against the defendant company than if it was
something else. The responsibility for a hole could be
charged to the State Highway Department for admit-
tedly it had jurisdiction over the surface of the high-
way. The responsibility for a ditch or gully could more
logically lead to the property of the defendant company.
If there is a physical bond between the sunken area
on Limekiln Pike and the property of the defendant
railroad underneath the highway, a causal relationship
is established upon which the charge of negligence may
be founded. Photograph P-3 shows that bond.

The majority opinion quotes three lines from the
testimony of the plaintiff witness Joseph Trunk and
from this fragment of the record concludes that the
"erosion began on land owned by the State." I do not
so read the record. The most that can be said about
the three quoted lines from Trunk's testimony is that
they present a conclusion of the witness. Trunk said
the gully looked "as though it formed at the bottom
first." This does not contradict anything which he said
before. He claimed through his entire testimony that
the gully formed *at the bottom of the embankment*:
"Q. I think I asked you something yesterday about the
erosion in this bank. Where in the bank did you first
notice the erosion start? A. At the bottom of the bank?
Q. Yes. A. I would say approximately 30, 35 feet from
the bridge east. Q. What was the course of this erosion?
How did it progress? A. Well, it started *going up from
the bottom of the bank, up until where this hole is*. It
just kept on washing away *at the bottom of the bank.*"
(emphasis supplied).

Upon cross-examination he maintained the same objective proposition from which he never deviated, namely, that the disintegration of the land first occurred on the defendant's property: "Q. You do not want to tell this Court and jury that you went down onto the railroad's property when this gully first formed and took a look to see where it started? A. Yes, sir. Q. You went down on the railroad property? A. Yes, sir." Photograph P-3 shows an enormous cavity at the bottom of the slope next to the railroad tracks. From this point a ravine 2 to 4 feet deep led to the top of the embankment.

And from this ditch or cavity at the bottom of the embankment (on railroad property) the defendant carried away dirt in such quantities that it had to be moved in railroad cars.

The witness Peter D'Angelo also testified to the same fact: "Q. I show you again Plaintiffs' Exhibit 3 and ask you what is the formation of this section in here at the bottom of the slope? A. Well, that is more of rocks and dirt right there. It is a solid—mostly stone, rock there. Q. What is it down in this section (indicating)? A. That is where your rock would come off the main or something. Q. Indicating the point at the end of the line? A. Yes." [line marked on photograph]

With the railroad company removing support at the bottom of the embankment it was inevitable that eventually the land would cave in somewhere at the top of the embankment. If one removes bricks from the bottom of a wall, a path of weakness will at once form to the summit, with the climaxing of a rupture or break at the top of the wall.

D'Angelo testified further: "Q. You spoke of this ravine and you have marked it on this picture. (indicating Plaintiffs' Exhibit 3). Do you know what happened to the dirt that was formerly in that ravine? A. I seen the railroad clean that ravine out, hauling the

dirt away with their cars and putting it in their gondolas, I think they call them. Q. How long had you seen that? A. I seen it at least three or four times."

Charged with the maintenance of the embankment, as it was, a duty devolved upon the railroad company to *fill* in the ravine, not dig it deeper. With each emptying of the ravine, a larger and deeper channel formed for the water and earth tumbling down the bank; and with this came a greater dislodgment of earth from the surface and the eventual breaking away of the lip of the road at the point where Mrs. Beal fell. The sequence of events which brought about the sloughing off of the roadway is chargeable to the defendant company as definitely as if it had used picks and shovels to cut away the pedestrian walk which Mrs. Beal and other wayfarers had the right to use.

The responsibility of the railroad company for this accident is clear. The question of lateral support does not lie in any twilight zone of jurisprudence. No one may pull the earth out from under his neighbor, nor can he use his land in such manner as to destroy the natural pillars which support the common highways.

In the case of *Rasmus v. Pennsylvania Railroad Company,* 164 Pa. Superior Ct. 635, 638, 67 A. 2d 660, the railroad company had made a cut into a hillside in widening its trackway, but had constructed no fence, rail or barrier to protect from harm pedestrians using the street bordering its right of way. In holding the railroad company liable for damages incurred by a minor plaintiff who fell over the embankment caused by the railroad excavations, the Superior Court said: "As to the railroad the rule is well settled, and of general application, that a property owner who makes an excavation on his premises so near to an existing highway as to render the use of the road unsafe, will be liable to a traveler who, exercising due care for his safety, nevertheless falls into it and is injured."

In *Pollock v. Pgh., Bessemer & Lake Erie R. R. Co.*, 275 Pa. 467, 119 A. 547, the plaintiff, a passenger in an automobile, was injured when the public road on which he was travelling, gave way, taking car and its occupants down a steep cut running parallel with the road, defendant having removed the lateral support from the highway. When the railroad company made the excavation some twenty years before the accident, it had left a bank or shoulder 5 feet in width. Through the action of the elements this gradually disintegrated, causing the land to slide away until when the accident happened the protection had receded to a point too close to if not within the highway limits.

In affirming the verdict rendered in behalf of the plaintiff the Supreme Court said: "The doctrine of lateral support is a very old one, and has uniformly been held to be the right of an owner to have his land supported and protected in its natural condition by the land of the adjoiner . . . When the railroad excavated alongside the highway and removed its necessary support there was a violation of the right for which the defendant was liable if damages resulted."

Whether the negligence occurred at the time of the original excavation or later is not material so long as there *was* negligence. The Supreme Court said further in that case: "At the time this excavation was made it was possible for defendant to so construct its work that no damage would result, or the stratification of earth might have been such as, in its judgment, to sustain the highway."

In the case at bar the defendant was charged with knowledge of the stratification of the earth in the slope supporting the highway; and it was for the jury to say whether its action in continuing to remove earth and stone from the embankment did or did not, in conjunction with the natural forces of erosion, bring about a disintegration of the highway to the point that it broke,

causing a rent in the surface, into which Mrs. Beal was precipitated to her injury.

A judgment n.o.v. cannot be supported in this case without a repudiation of *McCarthy v. Ference,* 358 Pa. 485, 58 A. 2d 49, decided in 1948 by a unanimous decision of this Court. In that case the plaintiff was injured when a bus in which he was riding was struck by rocks falling from a hillside overlooking the highway over which the bus was travelling. The highway had been constructed by the defendant Jones & Laughlin Steel Company and the Pittsburgh & Lake Erie R. R. Co., and then, being dedicated to public use, was taken over by the State Highway Department for maintenance. The defendant Jones & Laughlin Steel Company owned the hillside involved in the accident and had become aware that for four years prior to the accident numerous landslides and falls of rock had invaded the highway. As stated by the Court, the plaintiff claimed that: ". . . since the construction of the road changed the natural slope of the hillside which had theretofore been stable and in repose, there was thereby created a duty on the part of the Land Company and the Steel Corporation, which, in dedicating the 50 foot roadway, had retained ownership, possession, dominion and control over the slope, of subsequent watchful inspection and proper maintenance of their land abutting on the highway, and that, by their negligence in failing to conduct such inspections and to undertake the measures the necessity of which such inspections would undoubtedly have disclosed, they became liable for the injuries caused by the accident which resulted."

It is a similar charge in this case, namely, if the railroad company had taken proper precautions to prevent the extension of the erosion and washing away of soil on its own land, the highway would not have weakened and the accident would not have occurred.

There, as here, the defendant company argued that no responsibility rested upon it since the highway on which the accident happened was under the exclusive jurisdiction of the Commonwealth. But this Court, with all the force of precedent and reason, declared: "The duty of a municipality or of the Commonwealth itself to provide for the safety of the travelers on a public road is something wholly distinct from the duty of the adjacent landowners not to impair such safety by negligence in the maintenance of their own lands beyond the highway limits where such lands had been artificially changed from their natural state."

Said the Court further: "It must once more be pointed out that the liability presently asserted by plaintiff is based upon negligence, not in the original location and construction of the highway, but in the failure of appellants as abutting landowners to perform their duty of properly inspecting and maintaining their property in such condition as not to be likely to cause danger to those traveling on the highway."

Exactly the same situation is true in the case at bar, namely, the failure of the Reading Company, abutting landowner to perform its duty of inspecting and maintaining its property in condition so that it would not likely cause danger to those traveling on the highway. The Reading Company's own engineer testified to the danger caused by erosion when adjacent land is not protected: "Q. Of course as an engineer you are familiar with the nature of these banks and that they will from time to time erode and wash away, are you not? A. That is right. Q. You know that sometimes in washing away, if you do not protect the adjacent land, it sometimes washes away part of that? A. It does, yes, sir."

But over and above the responsibility of the railroad company landowner to provide lateral support for the

highway, the defendant company is responsible on the fundamental charge of negligence, namely, the absence of care under the circumstances. In the case of *Mc-Grew v. Stone,* 53 Pa. 436, 442, decided as far back as 1866, this Court said: ". . . when we are engaged in an act which the surrounding circumstances indicate may be dangerous to others or their interests, and when the event whose concurrence is necessary to make our act injurious, is one which we can readily see may occur under these circumstances, and unite with the act to inflict an injury, we are culpable if we do not take all the care which prudent circumspection would suggest to avoid the injury." Also, "the general rule is, that a man is answerable for the consequences of a fault which are natural and probable, and might therefore be foreseen by ordinary forecast."

Could the railroad company have foreseen what occurred in this case? Only rejection of natural phenomena could answer that question in the negative. When the railroad company cut through the hillside it performed an operation which of itself affected the stratification of the surrounding terrain. As a ship cannot pass through water without temporarily disarranging ocean currents, levels and depths, so a steam shovel cannot eat its way through land without affecting the molecular order of what remains—particularly the facing of the earth which has just been sliced or gouged. Then, with the vibrations of heavy trains thundering through the artificial gorge, it is not unreasonable to foresee that the stratification of the earth will be further discomposed. It is because of this inevitable discomposition that sliced hillsides along highways are so often girded with heavy masonry.

The large aperture in the bank next to the railroad tracks, clearly observable in plaintiff's exhibit P-3, certainly was not caused by what occurred at the

*top* of the embankment. It was an effect caused by either the original excavation, the movement of the trains, natural erosion, weather conditions or from a combination of any number of these causes with possible other undisclosed causes. Regardless of origin, however, the undisputed fact remains that the slope at this point discharged so much dirt and rock that the railroad company had to carry it away on freight cars. Joseph Trunk, who is employed as a police officer and resided close to the scene of the accident for 20 or 25 years, and Peter D'Angelo, who also lived in the vicinity, both testified that they had seen the railroad company carry away dirt from this gash in the lower slope many times, and as recent as a month and a half before the accident.

The defendant company also knew that from this cavity a ravine led directly to the crest of the embankment, and it was accordingly charged with notice of the breaking away of the highway at the top terminus of the ravine. That such a situation presented a definite peril to persons travelling on the highway was something that came within the range of ordinary forecast, as pointed out in *McGrew v. Stone,* supra, and this knowledge imposed on the defendant company a responsibility to take action to avert the peril. This action it failed to take.

In Restatement, Torts, Sec. 365, it is said that "A possessor of land is subject to liability for bodily harm caused to others outside the land by the disrepair of a structure or other artificial condition thereon, if the exercise of reasonable care by the possessor . . . (a) would have disclosed the disrepair and the unreasonable risk involved therein, and (b) would have made it reasonably safe by repair or otherwise." In comment a to this section it is said that "The word 'disrepair' indicates that the condition of the structure has de-

teriorated since its creation. It includes dilapidations caused by the usual force of nature . . .”

In *McCarthy v. Ference,* supra, which, in my opinion, I repeat, must be overruled before this judgment n.o.v. can stand, Justice HORACE STERN enumerated many cases in which recovery was affirmed by this Court where the possessor of land was held liable even though the accident occurred not on his land but on adjoining land. Some of them are as follows: Where the owner of a lot on the slope of a hill allowed dirt to fall therefrom upon land situated further down the slope; where lower property owners on a steep slope were damaged by the action of defendants in making a fill on their lands further up the slope, which caused a slide and consequent injury to plaintiffs' lands and buildings; where an owner allowed a loose piece of concrete to fall from a wall and injure a person working on the adjoining land, it being held that the defendant was obliged to consider the fact that stone may deteriorate and become a menace to human safety, and therefore was under the obligation to have the wall inspected at intervals; where, by reason of filling operations, earth and stone were allowed to slip down from the fence of a steep hill to plaintiff's property at the base thereof; where dirt, stones and other debris from excavations on defendant's land fell or were washed down upon plaintiff's lower-lying land; where a person passing on the street was injured when a fence which had been erected on the ground of the abutting owner and allowed to become dilapidated and in disrepair was blown on him by a high wind; where a person on the street was struck by a piece of tin and wood blown by a storm from a sign located a few feet from the highway.

In all these cases the injured person was victimized by events culminating on land not owned by the de-

fendant but originating on his own land, as is true in the case at bar.

The majority opinion states that the fact that the State constructed a wall at the top of the bank after the accident confirms the conclusion that the erosion began on land owned by the State. In the first place, whether introduced at the trial with or without objection, what follows an accident is irrelevant and never to be considered as evidence of pre-accident negligence. In the second place, there is nothing in the record to substantiate the statement that the defect *was cured* by the stone wall. Clarence F. Hess called by the defendant testified as follows: "Q. This photograph shows that something has been built at that point. What is that, Mr. Hess? A. A stone abutment has been built, I presume to hold the embankment up. Q. Who built that? A. I do not know. Q. What is the purpose of that abutment? A. I presume to hold the embankment up."

Even if we presume that the stone abutment will hold the embankment up *at that point,* there is no assurance that the highway may not suffer at some other point if the defendant company does not properly care for and maintain the sustaining slopes on its own land.

As I view this whole case a judgment n.o.v. is unsupportable on the law or on the facts. Since the defendant company, by pressing for judgment n.o.v. in effect agrees with plaintiff's counsel that a new trial is unnecessary, I would, therefore, reverse the lower Court's order for a new trial, and order judgment be entered on the jury's verdict.