437 A.2d 435

**COMMONWEALTH of Pennsylvania**

v.

**Charles TUMMINELLO, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 14, 1980.

Filed Nov. 20, 1981.

Petition for Allowance of Appeal Denied
April 2, 1982.

382

384

John H. Corbett, Jr., Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

Before SPAETH, JOHNSON and POPOVICH, JJ.

POPOVICH, Judge:

Appellant, Charles Tumminello, was found guilty of Criminal Conspiracy[1] and Aiding Consummation of Crime[2] by a jury. Following the filing of post-trial motions, appellant was sentenced to three (3) years probation, ordered to make restitution and to pay the costs of prosecution. This appeal from the Judgment of Sentence followed, which we now affirm.

On appeal, appellant, represented by counsel other than trial counsel,[3] complains that: 1) the evidence was insufficient to warrant his conviction; 2) trial counsel was ineffec-

1. 18 Pa.C.S.A. § 903(a)(1).

2. *Id.* at § 5107.

3. Private counsel withdrew from representing appellant at the completion of the trial. The trial court ordered an attorney from the Allegheny County Public Defender's Office to file post-trial motions. One of the claims raised therein related to trial counsel's ineffectiveness, which was denied.

tive; and 3) the trial court erred in admitting certain testimony by a Commonwealth witness into evidence.

The facts relating to the instant case, when viewed in a light most favorable to the Commonwealth, see *Commonwealth v. London*, 461 Pa. 566, 337 A.2d 549 (1975); *Commonwealth v. Malone*, 444 Pa. 397, 281 A.2d 866 (1971), reveal that around 4:00 P.M. on October 17, 1978, Mrs. William Adams returned home to find her residence burglarized. The safe, containing various items of value, a "CB" radio, "Fuzzbuster," money and assorted gems valued at $35,000 to $40,000 were missing. The theft was reported to police.

In an incident unrelated to the Adams' burglary, the Fox Chapel police, on November 10, 1978, pursued Dolores and Jeffrey Snyder in a high-speed chase before arresting them for robbery, burglary and aggravated assault. The Fox Chapel authorities, believing that the incident was part of a major burglary ring operating in the township, contacted the Allegheny County Police for assistance. Det. Morton, who was also involved in the Adams investigation, was assigned to the case.

On the night the Snyders were taken into custody, Det. Morton interviewed Jeffrey. During the course thereof, Jeffrey made various phone calls in Det. Morton's presence, one of which was to the appellant. On November 16, 1979, a preliminary hearing was held for Jeffrey Snyder, at which the appellant was seen by Det. Morton but he thought nothing of the association. It so happened that three days after the proceeding, Det. Morton was contacted by one William Bender. A meeting was set up and, in the presence of an assistant district attorney and Det. Morton, Bender incriminated himself, the Snyders and the appellant in the Adams burglary. Appellant was arrested on December 5, 1978.

Appellant questions the sufficiency of the evidence to establish his guilt for criminal conspiracy.

The essence of conspiracy is a common understanding or agreement. *Commonwealth v. Fontana*, 265 Pa.Super. 387, 401 A.2d 1361 (1979). However, the Commonwealth is not required to establish the existence of a conspiracy by direct proof or an explicit or formal agreement. *Id.* "Indeed, direct proof of an explicit or formal agreement to commit a crime can seldom, if ever, be supplied and it need not be for 'it is established law in this Commonwealth that a conspiracy may be proved by circumstantial evidence as well as by direct evidence.'" *Commonwealth v. Roux*, 465 Pa. 482, 488, 350 A.2d 867, 870 (1976). The nature of the crime usually makes it susceptible of no other proof than by circumstantial evidence. *Commonwealth v. Evans*, 190 Pa. Super. 179, 154 A.2d 57 (1959), aff'd 399 Pa. 387, 160 A.2d 407 (1960), *cert. denied*, 364 U.S. 899, 81 S.Ct. 233, 5 L.Ed.2d 194, *reh. denied*, 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371. To assist the finder of fact in determining whether a corrupt confederation is present, the relationship and conduct of the parties and the circumstances surrounding their activities can be examined to deduce, inferentially, if a conspiracy exists. *Commonwealth v. Fontana*, supra. In the case *sub judice*, the jury had the uncorroborated testimony of a co-conspirator (William Bender), which, if believed, would be sufficient proof to support a conviction. *Commonwealth v. Ridgely*, 243 Pa.Super. 397, 365 A.2d 1283 (1976).

At trial, Bender recounted how he and the Snyders gained entry into the Adams' home and then ransacked the premises looking for a safe. After it was found, Jeffrey and Bender placed it in the trunk of the vehicle. En route from the scene, Bender stopped to allow Jeffrey to make a phone call. When Bender inquired whom he had called, Jeffrey answered, "I called Chuck, 'Who else would I call.'" (N.T.20) Bender then drove to appellant's residence; upon arrival, Dolores Snyder knocked on the front door. According to Bender, "[appellant] was rather happy to see Dolores. He kissed her, and [appellant] shook his—Jeffrey Snyder's hand, and [Bender] shook [appellant's] hand." (N.T.22) Once inside, Jeffrey asked appellant where they could work,

and appellant stated, "Back your vehicle into the garage." (N.T.25) Appellant assisted the others in lifting the safe out of the trunk and supplied to tools (a wood wedge and a two and a half pound sledge) to open it. (N.T.27) Once opened, its contents were divided among the group—appellant "was handed $300," and other items from the burglary. (N.T.33–34) The appellant then led the group to a nearby stream where the safe was disposed of.

Appellant's accounting of the incident was at odds with Bender's version. For example, appellant admitted receiving a phone call and to seeing Jeffrey, but that the visit was less than cordial. That is, Jeffrey was described as brandishing a gun and ordering the appellant to "Get the fuck out of here." (N.T.19) Appellant went on to testify that he felt so "intimidated" that he retreated to a separate room and remained there during the more than 3½ hours that the trio used his garage. (N.T.11 & 23) Further, appellant stated that the police were not called because he was "frightened ... they[, i. e., the Snyders and Bender,] might retaliate against [him] because they had made th[e] threat to [him]." (N.T.23) Additionally, appellant denied aiding in disposing of the evidence or sharing in any profits secured from the Adams' home.

 Given the divergency in the testimony of the witnesses, and since it is within the prerogative of the fact finder to believe all, part or none of the testimony of any witness, *Commonwealth v. Roux*, supra, "we will not engage on appeal in a weighing of the evidence in an attempt to second-guess the jury, for such is not our function." (Citations omitted) *Commonwealth v. Harrison*, 290 Pa.Super. 389, ——, 434 A.2d 808, 811 (1981); *Commonwealth v. Ridgely*, supra. Suffice it to say, we find that the evidence adduced at trial established the existence of a conspiracy to rob the Adams' home. As a corollary thereto, we hold that the completion of the burglary *did not terminate* the conspiracy, and that trio's flight to the appellant's home (prior to which Snyder phoned the appellant that he was coming over) and the group's efforts to conceal the evidence (during

which the appellant made incriminating remarks testified to by Bender) were done in furtherance of the confederation. See *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981). Accordingly, we determine that the evidence presented was " 'competent to prove that a corrupt confederation ha[d] in fact been formed[,]' " *Commonwealth v. Roux*, supra, 465 Pa. at 488, 350 A.2d at 870, and that appellant "intentionally aid[ed] another to accomplish an unlawful object of a crime, as by safeguarding the proceeds thereof . . . ." 18 Pa.C.S.A. § 5107(a). The fact that the appellant may not have been present during the burglary makes him no less accountable for the acts of his co-conspirators. See *Commonwealth v. Roux*, supra; *Commonwealth v. Burdell*, 380 Pa. 43, 110 A.2d 193 (1955).

Appellant's second claim attacks trial counsel's stewardship for permitting damaging hearsay evidence to be introduced without objection. The complaint of testimony was elicited from Mr. Bender. The first concerns Jeffrey's response to Bender's inquiry as to whom he had phoned after the burglary, to which Jeffrey answered, "I called Chuck, 'Who else would I call.'" (N.T.20) The second attributes appellant with saying, in response to Jeffrey's statement that the evidence could be removed to a location near a church, "Oh, yeah, I know where you're talking about." "There's a little stream down there you can dump it in, the water's about 'fifteen feet deep." (N.T.37)

 To start with, the examination and cross-examination of witnesses and the determination as to when to interpose objections are matters clearly within the province of trial counsel. *Commonwealth v. Witherspoon*, 481 Pa. 321, 392 A.2d 1313 (1978). Next, we do not take issue with appellant's categorization of the statements made by Bender as "hearsay." However, in Pennsylvania, the out-of-court declarations of one co-conspirator can be admitted against another co-conspirator provided that the declarations were made during the conspiracy and in furtherance of the common design.

 In *Commonwealth v. Evans*, 489 Pa. 85, 413 A.2d 1025 (1980) our Supreme Court reaffirmed its approval of the use of evidence of a co-conspirator's attempt to conceal evidence *after the commission of a crime*, finding that such acts "c[a]me within the scope of the conspiracy to commit the crime." *Id.*, 489 Pa. at 92, 413 A.2d at 1028. In so doing, the *Evans* court directed that the following test be followed:

" 'The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members. Generally, the conspiracy ends when its principal objective is accomplished because no agreement to retain secrecy after the achievement of the unlawful end can be shown or implied by mere "acts of covering up." Thus in *Grunewald v. United States*, supra, 353 U.S. [391] at 402, 77 S.Ct. [963] at 972, [1 L.Ed.2d 931 (1957),] the Supreme Court stated, "Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." But the fact that the "central objective" of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such agreement may reasonably be inferred, the conspiracy may be found to continue. *Atkins v. United States*, 307 F.2d 937, 940 (9th Cir. 1962); cf., *United States v. Allegretti*, 340 F.2d 254, 256 (7th Cir. 1964), *cert. denied*, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). . . . The crucial factor is the necessity for some showing that the later activities were part of the original plan.' " (Footnote omitted) (Citations omitted) *Id.*, 489 Pa. at 92–93, 413 A.2d at 1028–29.

Applying this test to the facts at bar, we observe that instantly we had more than mere "overt acts of concealment." *Commonwealth v. Evans*, supra, 489 Pa. at 93 n. 7,

413 A.2d at 1029 n. 7. To-wit, we had evidence of a "conversation" between Jeffrey and appellant as to the selection of the best site for the disposal of the safe. As a result, we conclude that, based on all the evidence and the reasonable inferences to be derived therefrom, the prosecution presented sufficient proof from which the jury could infer that the group agreed to take certain steps after the principal objective of the conspiracy was reached to conceal the evidence as part of the conspiracy. *Id.* Therefore, we are persuaded that the *statements* made by the appellant in Bender's presence were declarations *made during the conspiracy* and in furtherance of the common design. See *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981); *Commonwealth v. Pass*, 468 Pa. 36, 360 A.2d 167 (1976); McCormick, Law of Evidence, § 267, p. 645 (2d Ed. 1972). We also find that Jeffrey's statement to Bender, incriminating the appellant, was likewise made *during the conspiracy* and in furtherance thereof. The fact that appellant was not present during the exchange does not militate against its use at trial. See *Commonwealth v. Ellsworth*, 409 Pa. 505, 187 A.2d 640 (1963). Consequently, since the statements were an exception to the hearsay rule, counsel cannot be deemed ineffective for failing to object to their admission at trial. See *Commonwealth v. Evans*, supra.

Lastly, appellant argues that Det. Morton's testifying as to Jeffrey phoning the appellant and to seeing appellant at the preliminary hearing were totally irrelevant to the charge of criminal conspiracy since they occurred *after* the purported confederation terminated. This, he urges, prejudiced him in the eyes of the jury. Such contention is predicated principally upon appellant's interpretation of the rulings of *Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564 (1973) and *Commonwealth v. Ellsworth*, supra.

In *Hickman*, the Commonwealth failed to *link* the murder weapon (a .32 caliber automatic pistol) to the defendant, who, on cross-examination, denied owning or taking such weapon to a shop for repairs. On rebuttal, the Commonwealth had the proprietor of a gunsmith shop testify to

repairing a Beretta pistol for the defendant and test firing it into a bullet trap that he had been using for ten years for just such purpose. All the bullets therein were retrieved, and the Commonwealth's ballistic's expert testified that two out of the eighty .32 caliber bullets removed therefrom had been fired from the murder weapon.

The court in *Hickman* found the expert's testimony to be irrelevant to the issue of the gunsmith's credibility. Also, the court found that the testimony did not corroborate the gunsmith's statement that the defendant had brought a .32 caliber pistol to his shop, nor did it tend to show the validity of that statement. As a result, because the expert's testimony was held irrelevant, the court determined that its potential prejudice warranted a reversal. Presently, unlike in *Hickman*, the Commonwealth *did link* the appellant with incriminating evidence (the stolen safe) through the testimony of a co-conspirator, the admissibility and validity of which we have discussed supra. Thus, we find that the testimony of Det. Morton was neither irrelevant nor prejudicial, since it buttressed evidence already admitted in the Commonwealth's case-in-chief that the appellant knew of and associated with Jeffrey. In fact, appellant admitted doing accounting work for Jeffrey and, as a client of his, socializing with him on occasion. Consequently, even if we assume for the sake of argument that Det. Morton's testimony was improperly admitted, "[e]rroneously admitted evidence is harmless if there is other evidence to establish the same facts." (Citation omitted) *Commonwealth v. Garcia*, 478 Pa. 406, 424, 387 A.2d 46, 55 (1978). Such was the case here.

Appellant's citation to *Commonwealth v. Ellsworth*, supra, does not alter our ruling, since, as noted above, the statements of Det. Morton were admitted principally to show that the appellant knew his co-conspirators, and not to establish the existence of a conspiracy per se.

Judgment of sentence affirmed.