667 A.2d 1123

COMMONWEALTH of Pennsylvania, Appellant,

v.

Samuel ENGLISH, Appellee.

COMMONWEALTH of Pennsylvania, Appellee,

v.

Samuel ENGLISH, Appellant.

Superior Court of Pennsylvania.

Argued June 15, 1995.

Filed Oct. 19, 1995.

Reargument Denied Dec. 28, 1995.

Gregory A. Stuck, Assistant District Attorney, Sunbury, for Commonwealth.

Jeffrey J. Crossland, Lewisburg, for Samuel English.

Before POPOVICH, JOHNSON and HOFFMAN, JJ.

POPOVICH, Judge.

This case involves cross-appeals from the order of the Court of Common Pleas of Northumberland County granting a motion for a new trial and denying an arrest of judgment.[1] We reverse in part and affirm in part.

The facts establish that on the 8th day of March, 1991, Sabrina Miller was phoned by her estranged husband that he would be picking up their son for visitation at 7:00 p.m. To avoid any conflict, Ms. Miller asked the appellant, who had

---

1. An order granting a new trial, albeit interlocutory, is appealable when a defendant claims, as here, that he is entitled to discharge. See Pa.R.App.P. 311(a)(5).

fathered her second son (Ryan, aged 2 months) out of wedlock, to remove himself from the premises until after Mr. Miller's departure. The appellant agreed and occupied himself at a neighborhood bar until a phone call was received to return at 8:00 p.m.

While at the bar, the appellant consumed 3–5 beers and some whiskey before leaving with two six packs of beer. Upon the appellant's return, the minor-child Ryan was asleep on the couch. Ms. Miller had placed two blankets over one of the cushions and the child was resting there.

During the course of the evening, Ms. Miller consumed 1–2 beers and was awakened by Ryan's crying at 3:00 a.m. The mother bathed, changed and fed the child before the two watched television and played. At approximately 5:00 a.m., Ms. Miller fell asleep on a reclining chair with Ryan fast asleep on top of her. At some point during the early morning hours of March 9th, Ms. Miller felt the child being lifted from her chest. The next thing she recalled was being startled by a phone ringing. Ms. Miller answered the phone and observed the appellant sleeping on the couch, face down and fully extended, so that his head was at one end and his legs (shins) were over the child's quilt and angled up so that his feet were over the right armrest.

When Ms. Miller informed the appellant that the call was for him, he sat to the left of the couch and spoke to the caller. Ms. Miller asked where Ryan was located and was told by the appellant the baby was on the couch. The child was not visible to Ms. Miller until she removed the bed quilt on the couch. Ryan was lying on his stomach in the center of the cushion with his head facing away from the back of the couch—this was next to the right armrest and on the opposite side of the appellant's resting place.

With Ryan's failure to respond to his mother's kiss, she became frightened and screamed that he was not breathing. The appellant gave the child "mouth to mouth" resuscitation while Ms. Miller dialed "911". Within minutes, an emergency medical technician arrived, followed close behind by an ambu-

lance. Cardiopulmonary resuscitation was continued by the technician before transporting the child to the hospital. The attending emergency room physician treated the child for one-half hour before pronouncing the child dead. The parents were advised that the physician attributed the cause of death to SIDS.[2]

An autopsy was performed and a corner's inquest was conducted in which the medical examiner believed that the death should be pursued as a criminal homicide—an "intentional" killing. A police investigation led to the appellant being charged with the homicide, but the District Attorney listed the offense as involuntary manslaughter—a "grossly negligent or reckless" killing. A two-day jury trial resulted in the appellant's conviction as charged. With the filing of post-trial motions, the court ordered a new trial on the ground that the "cumulative effect" of alleged errors committed by the Commonwealth prejudiced the appellant, but the request for an arrest of judgment was denied. Cross-appeals were filed challenging the order entered.

Initially, we examine whether the court below abused its discretion in granting a new trial on grounds that the Commonwealth asserts were waived by English. The court believed that the "interests of justice" required the grant of a new trial with the "cumulative effect of errors" committed during the course of trial.

■■■ The first alleged error, discernible from a reading of the court's opinion as contributing cumulatively to prejudicing the appellant's right to a fair trial, is a conversation overhead by Ms. Miller on the first floor of the courthouse during a recess in which two females purportedly engaged in the following; to-wit:

> ... one lady had said that she recognized [the defendant] from being in the paper with his charge that he's serving for now. And the other woman had said that, yes, that she was just thinking about that.

2. SIDS is an acronym for Sudden Infant Death Syndrome.

N.T. 231. When Ms. Miller was asked if the two women were jurors, she "assumed" they were but she was not one hundred percent sure. In fact, she stated it was "possible" the two ladies were just observers in the courtroom because she did not recall whether either one wore an identifying juror button.

Out of an abundance of caution, the court offered the appellant the opportunity to *voir dire* the jury concerning the alleged communication and its knowledge of such an exchange.[3] The defendant, after consulting with counsel, opted to forego any formal inquiry of the jurors and "proceed just as is," notwithstanding the court's admonition that the matter would be waived if not pursued at that stage of the case. The defendant, with "certainty," asked to "proceed forward." The court did so only to have the issue raised in post-verdict motions under the banner of prosecutorial misconduct "when this information was not made known to Defendant until almost 24 hours later, and after closing arguments...." to the prejudice of the defendant. See Paragraph 21.

 It is axiomatic in this jurisdiction since *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974) and its progeny that one must object to errors, improprieties or irregularities at the earliest possible stage of the criminal or civil adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.[4]

 Here, the defendant was given every opportunity to inquire into the sum and substance of the alleged out-of-court

---

**3.** The court, without objection from either side, formulated the following question to be posed to each juror; to-wit:

It's been brought to our attention that two women that may or may not be jurors in this trial were overhead talking about the defendant and/or this case. This conversation occurred on the lower floor yesterday around or after the luncheon recess and the discussion centered around whether one of them recognized the defendant from a picture in the paper and/or prior involvement in the criminal justice system.
N.T. 242.

**4.** The new Pennsylvania Rules of Criminal Procedure are not applicable here since the determination of guilt occurred prior to January 1, 1994.

576

communication as either real or fanciful, substantive or base-
less, but he elected to give up the occasion to delve into the
subject in favor of proceeding to verdict.[5] His choice having
been made to forego inquiry of any possible jury taint cannot
be resurrected in either the post-verdict or appellate format.
*Dilliplaine,* supra; see also *Commonwealth v. Clair,* 458 Pa.
418, 326 A.2d 272 (1974). Disenchantment with or gambling
on the jury's verdict may not be cloaked in the guise of
"prosecutorial misconduct" to avoid the rigors of the issue-
preclusion rule of *Dilliplaine,* supra. Accordingly, the circum-
vention of the issue preservation rule mandates that the
present issue of prosecutorial misconduct in not disclosing
sooner possible jury taint be deemed waived for appellate
purposes.[6]

■ The second prong to the court's finding of "cumulative
effect of errors" fares no better. Specifically, the court holds
that, in tandem with the waived *voir dire* of jury issue, "the
potential prejudicial effect of the expert testimony offered by
the Commonwealth ... require[s] that the Defendant be
granted a new trial" to effectuate justice.

At trial, the Commonwealth's expert (Dr. Wayne Ross)
testified that the cause of death was cardio-pulmonary arrest
due to complications of asphyxia. The expert also offered that
bleeding on the lungs (petechial hemorrhages) and the thymus
gland in the chest were indicative of insufficient oxygen
brought on by a compression of the chest from a hand pushing
down on the back and head. This prompted Dr. Ross to opine

5. It is not implausible that the defendant, after consulting with counsel,
believed that the evidence was not sufficient to convict or possible
disclosure of his prior criminal conduct might surface during jury
questioning, and chose to allow the jury as composed to decide the
case. Such trial strategy cannot be equated with any claim of counsel's
ineffectiveness. See generally *Commonwealth v. Watts,* 319 Pa.Super.
179, 465 A.2d 1288 (1983).

6. From our review of the record there is not a scintilla of evidence to
show that the prosecution, in regard to disclosing the out-of-court
discovery of Ms. Miller, acted "intentionally" to provoke a mistrial.
See *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416
(1982); *Commonwealth v. Beaver,* 317 Pa.Super. 88, 463 A.2d 1097
(1983).

that the child died with its face down, brought on by a combination of chest compression and suffocation not found in SIDS cases.

Moreover, the expert remarked on cross-examination that, as to the manner and method of death, "somebody ... probably put their hand over the back, put their hands on the back of the head, not in the front of the face, and took the face and put it in between the two cushions, and in that way suffocated [the baby] compressing the nose down in between and on one of the cushions." N.T. 187. The Commonwealth objected to such testimony and at sidebar noted that the defendant was not indicted for the commission of an "intentional" killing, but the defense was leading the witness to that point. The court overruled the objection and permitted the defense to rebut testimony describing an intentional killing by the Commonwealth's expert on direct examination. In the course of doing so, however, the expert opined that "somebody intentionally killed the child." N.T. 190. He believed so even though he was aware that the defendant had been charged with only involuntary manslaughter.

The defendant requested that the expert's testimony be stricken. The court took the matter under advisement and, prior to closing arguments, granted the request in so far as it struck the doctor's opinion that the child's death was an intentional act and the jury would be instructed accordingly. Nonetheless, after the court's ruling but before instructing the jury, the defendant moved for a mistrial claiming that the jury's exposure to such testimony was prejudicial, even though during trial the objection sought relief in the form of striking the testimony and not a mistrial. The court advised the defendant to consult with counsel before choosing to withdraw the mistrial motion. The defendant did so and informed the court that he did not wish to have his motion for mistrial considered.

Again, as with the *voir dire* issue, the defendant caused the mistrial claim to appear in post-verdict motions as court error in allowing the elicitation by the prosecution of Dr. Ross'

testimony of an intentional killing, the relief for such was a new trial. See Paragraphs 22 and 23.

The precepts enunciated by *Dilliplaine,* supra, are applicable here so that the appellant's failure to preserve his mistrial objection, and instead opting to have the jury decide his fate despite exposure to Dr. Ross' "intentional" killing observations, renders it waived for appellate review.[7] Accord-

7. Even if, *arguendo,* the issue were not waived, we note that the doctor's discussion of facts indicative of an "intentional" killing (hands pushing against the child's back and head causing its face to be forced against or between cushions) went unabated. See, e.g., N.T. 159, 162, 168 & 170.

The first objection lodged by the defendant was to the witness' opinion testimony that outside force caused the child's head to move and striations to appear on the face matching the couch-covering, which was *after* testimony had been offered by Dr. Ross implying the same. Moreover, on cross-examination the defendant continued to question the doctor as to the foundation for his "outside force" theory causing the child's suffocation. Thus, the defendant cannot be heard to complain now to evidence admitted without objection and exploited by the defense to assail the doctor's believability on the manner and method of the minor-child's death. See generally *Commonwealth v. Tumminello,* 292 Pa.Super. 381, 437 A.2d 435 (1981).

The trial court's citation to *Commonwealth v. Kramer,* 389 Pa.Super. 136, 566 A.2d 882 (1989), to substantiate its "cumulative effect of errors" theory to support its grant of a new trial is misplaced. The errors found to warrant a new trial in Kramer were *asserted by the defendant at trial* in the form of mistrial motions initially denied but later reversed at the post-verdict stage by the trial court.

Here, the defendant *waived* the allegations of error after consulting with his attorney during the midst of trial, each of which could have been addressed at that point and not await the outcome of the jury's verdict to raise the claims.

We find that trial strategy played a role in the defendant's waiver of the now claimed trial errors in the hope of being found not guilty. He will not now be heard to claim entitlement to review of matters withdrawn from trial inquiry and possible rectification before the close of the case. To allow such a *post hac* approach would be to reward the defendant for his inaction and award him two bites at the proverbial guilt-determining-process apple.

We wish to respond to the trial court's characterization of the defendant's refusal to pursue a mistrial for the doctor's "intentional killing" testimony as a "Hobson's choice," since he might expose himself to the prosecution amending the indictment to charge first degree murder instead of involuntary manslaughter. This position falters under the light of scrutiny.

To explicate, the defendant, having chosen to have the jury decide his fate and despite the doctor's comments on the manner and method of ·

ingly, having found no merit to any of the trial court's "cumulative effect of errors" determination, the grant of a new trial is reversed. *Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240 (1991); *Beal v. Reading Co.*, 370 Pa. 45, 87 A.2d 214 (1952).

■ Next, we turn to the defendant's contention that the evidence was insufficient and warranted his arrest of judgment motion. Since the motion challenges the sufficiency of the evidence, the test to be applied is "whether, accepting as true all of the Commonwealth's evidence and all reasonable inferences therefrom, the evidence is sufficient to prove beyond a reasonable doubt that [the defendant] is guilty of the crime[ ] charged." *Commonwealth v. Morrison*, 265 Pa.Super. 363, 401 A.2d 1348, 1351 (1979); *Commonwealth v. Danner*, 45 D. & C.3d 206, 207 (York Cty.1986).

Involuntary manslaughter is a crime which requires proof that the death of another was caused by the "reckless or grossly negligent" act of a defendant. 18 Pa.C.S.A. § 2504(a).

At bar, we have testimony that the defendant had consumed 3–5 beers and tasted a whiskey between 6:00–8:00 p.m. on the 8th of March, 1991. He brought two six packs of 12 oz. beers to Ms. Miller's apartment, 1–2 of which were ingested by Ms. Miller and only 2 or 3 cans remained within 48 hours of the minor-child's death.

death (outside force applied to the child's back and head contributed to suffocation), has the benefit of knowing the outcome of the verdict and would be availed a new trial to obtain a second attempt at vindicating himself. However, the defendant has no greater assurance at this point (as at the trial level) that the prosecution would not seek a first degree murder charge if the award of a new trial were upheld.

If the "Hobson's choice" existed at trial, it certainly existed at the post-verdict level with the defendant's request for a new trial without any guarantee that the Commonwealth would not seek what he was attributed by the trial court in fearing, i.e., a step-up in the charge to first degree murder. The benefit to the defendant is that now he knows his trial strategy seeking full vindication did not bear fruit. The trial court would ignore the presence of waiver and award a new trial. We, on the other hand, see no reason to condone such conduct by the defendant under the rubric of "interests of justice." See *Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240 (1991).

The sleeping arrangements were such that the defendant placed a 2–month–old baby at one end of a couch while he reclined on the other end. Yet, when the mother awoke, she found the defendant lying on the entire couch such that his legs extended over and on top of the sleeping area of the baby. The child was not breathing when found by the mother under the quilt covering the child and above which the defendant's legs extended.

The Commonwealth's medical expert testified that the child's death was the product of an object compressing against its back and head causing suffocation. Moreover, the expert testified without objection by the defendant that he believed that the death was caused by an "intentional" act; to-wit: 1) the striations on the face of the child matched the pattern on the couch's cushions; 2) "Mongolian spot"—usually found in SIDS cases above the lower pelvis sacral region—was not evident on Ryan; 3) blood spots on the child's lungs consistent with suffocation; 4) expert opined that a child of 2 months could not have maneuvered its head into an area between the two cushions, which was consistent with the striations left on the child's face and visible during autopsy; and 5) the settlement of the blood in the body upon death (lividity and cyanosis) was consistent with the child's body having been compressed against the cushion of the couch causing death by suffocation.

Given the defendant's proximate position to the child on the couch, the fact that he had ingested alcohol prior to sleeping on the same unit as the child and no precautions were taken to provide for the safety of the baby in its vulnerable sleeping location are consistent with "a great departure from the standard of ordinary care, evidencing a disregard for human life or an indifference to the possible consequences of the actor's conduct." *Commonwealth v. Agnew*, 263 Pa.Super. 424, 398 A.2d 209, 211 (1979).

It was the defendant who moved the child from the embrace of his mother and placed him in a position on the couch which culminated in a suffocation death not symptomatic of SIDS. The autopsy showed that force was applied to the child's body

causing it to compress against the cushion of the couch and the defendant was observed with his legs over the child's sleeping area immediately prior to finding him expired from asphyxia.

The volume of circumstantial evidence, albeit not individually sufficient to convict, when read in concert is sufficient to show that the defendant was the direct cause of the child's death, whose behavior constituted a great departure from the standard of ordinary care called for in attending to an infant. Contrast *Commonwealth v. Pennell*, 9 D. & C.4th 241 (Potter Cty.1991); *Danner*, supra.

 The jury heard all of the evidence and found sufficient proof of involuntary manslaughter. We have been presented with no argument to alter that verdict. In fact, upon remand, the initial verdict of the jury is to be reinstated and sentence to be imposed thereafter.[8] Order granting a new trial is reversed; appeal of the same order denying arrest of judgment affirmed. Case remanded for reinstatement of verdict and sentence. Jurisdiction relinquished.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting.

While I agree with that portion of the Majority Opinion which affirms the trial court's denial of the motion for an arrest of judgment, I am unable to agree that the trial court

---

8. We wish to comment on the Commonwealth's contention that the trial court's order granting a new trial was a subtle hint that the defendant should be retried for an "intentional killing," as commented upon by its own expert at the coroner's inquest and at trial.

Suffice it to say, without undue elaboration and citation to authority, it is for the District Attorney to decide whom to indict and what charges to lodge against an accused. *Commonwealth v. Slick*, 432 Pa.Super. 563, 639 A.2d 482 (1994). It is not for the judiciary to interject itself into the indictment process, a function which the Legislature has reserved solely for the prosecuting attorney, absent a gross abuse of discretion, to exercise. *Id.* We have been presented with no evidence to cast a cloud of suspicion upon the District Attorney's indictment process to believe that he has grossly abused his discretion in charging the defendant with involuntary manslaughter instead of first degree murder.

abused its discretion in granting a new trial. Accordingly, I must respectfully dissent.

The trial court determined that the interests of justice required the grant of a new trial due to the cumulative effect of errors at trial. Our supreme court has stated that "[a] trial court has an 'immemorial right to grant a new trial, whenever, in its opinion, the justice of the particular case so requires.'" *Commonwealth v. Powell*, 527 Pa. 288, 293, 590 A.2d 1240, 1242 (1991), quoting *March v. Philadelphia & West Chester Traction Co.*, 285 Pa. 413, 416, 132 A. 355, 357 (1926). Further,

[i]t is the trial judge's review of the conditions and activity surrounding the trial which leaves him or her in the best position to make determinations regarding the fairness of the process and its outcome. It is apparent, therefore, [that] if a trial court determines that the process has been unfair or prejudicial, even where the prejudice arises from actions of the court, it may, in the exercise of its discretionary powers, grant a new trial "in the interest of justice."

*Id.*, 527 Pa. at 294, 590 A.2d at 1243. Recently, our supreme court, quoting *Echon v. Pennsylvania Railroad Co.*, 365 Pa. 529, 534, 76 A.2d 175, 178 (1950), stated:

"When the court has come to a conclusion by the exercise of its discretion, the party complaining of it on appeal has a heavy burden; it is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. 'An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.' *Mielcuszny et ux. v. Rosol*, 317 Pa. 91, 93, 94, 176 A. 236 [ (1934) ]."

*In re Milton S. Hershey Medical Center,* 535 Pa. 9, 13–14, 634 A.2d 159, 161 (1993); *Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995).

Here, English, in his post-trial motions, asserted that he was entitled to a new trial based upon prosecutorial misconduct and the Commonwealth's introduction of prejudicial evidence. The trial court found that although none of the trial errors were so prejudicial that they could not be cured by appropriate jury instructions, "the cumulative effect of these errors may have been to prejudice the jury against [English], thereby depriving him of a fair and impartial trial...." Footnote to Order, dated August 22, 1994, at 1. Specifically, the trial court took issue with the contradictory way in which the Commonwealth presented its case. The Commonwealth charged English with involuntary manslaughter, alleging that the child's death occurred as a result of criminal recklessness or negligence. However, at trial, the Commonwealth's expert, a forensic pathologist, testified that the child's face was pushed into the sofa cushions by some "outside force." N.T., November 18, 1993, at 173–74. Defense counsel lodged an objection, contending that such an assertion went completely beyond the charge of involuntary manslaughter and suggested, instead, that the child was intentionally suffocated. *Id.* The trial court overruled the objection. *Id.* at 177–78. On cross-examination, defense counsel questioned the forensic pathologist as to whether, in his opinion, "somebody" intentionally pressed the child's face into the sofa cushions. *Id.* at 187. After the pathologist replied in the affirmative, the Commonwealth objected, claiming that such testimony went beyond the scope of the expert's testimony presented during direct examination. *Id.* at 188. The court overruled the objection. *Id.* at 189. However, the following day, just prior to instructing the jury, the court directed the jury that the forensic pathologist's testimony that the child's death was an intentional act was stricken from the record. *Id.* at 226. The court further directed the jury to totally disregard such testimony. *Id.* In its Order, the trial court found that the introduction of evidence which suggested that the child was

intentionally killed caused clear prejudice to English. Footnote to Order, *supra,* at 2. I agree. Given the fact that the jury did not receive the instruction to disregard this prejudicial evidence until the following day, I find no abuse of discretion in the court's conclusion that, in the interests of justice, a new trial was required.

In addition, the child's mother reported overhearing a conversation between two women who may have been jurors. One of the women stated that she recognized English from an item in the newspaper concerning a prior crime he had committed. The other woman responded that she had been thinking about that as well. N.T., *supra,* at 231. The court allowed English the opportunity to voir dire the jury, but he declined to do so. *Id.* at 244–45. In its Order, the court expressed concern that, despite English's waiver of his right to voir dire the jury, "the jury may have been tainted to the extent that [English]'s conviction could [have been] based in part on prejudicial hearsay outside the record." Footnote to Order, *supra,* at 3. Based upon this factor and the introduction of evidence which suggested that the child was intentionally killed, the court ordered a new trial.

The Majority concludes that the trial court abused its discretion in granting a new trial because English did not object to the trial errors or improprieties at the earliest possible stage of the proceedings. Majority op. at 574–75, 575–77. However, my research has not disclosed any authority for the proposition that the trial court is foreclosed from granting a new trial in the interests of justice based upon any action or inaction by defense counsel. In fact, our supreme court "has expressly approved of a trial court's granting a new trial, *sua sponte,* for the promotion of justice, if sufficient cause exists." *Powell, supra,* 527 Pa. at 293, 590 A.2d at 1242. *See also Commonwealth v. Tyson,* 535 Pa. 391, 635 A.2d 623 (1993) (trial court's grant of post-conviction relief in the interests of justice was affirmed even though appellant's issues were previously raised and decided on direct appeal). Therefore, based upon the above-stated standards, I find no abuse of discretion in the trial court's grant of a new trial, and I

would affirm the trial court order in its entirety. Hence, this dissent.